# FEDERAL MARITIME COMMISSION ET AL. *v.* PACIFIC MARITIME ASSN. ET AL.

No. 76–938.   Argued December 7, 1977—Decided March 1, 1978

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, REHNQUIST, and STEVENS, JJ., joined. POWELL, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, ·p. 64. BLACKMUN, J., took no part in the consideration or decision of the case.

*Deputy ·Solicitor General Friedman* argued the cause for petitioners. With him on the briefs were *Solicitor General McCree, Acting Assistant Attorney General Shenefield, Marion L. Jetton, Robert B. Nicholson, Robert J. Wiggers, Richard E. Hull, Edward G. Gruis,* and *Gordon M. Shaw.*

*R. Frederic Fisher* argued the cause for respondent Pacific Maritime Assn. With him on the brief were *Edward D. Ransom* and *Gary J. Torre. Norman Leonard* argued the cause and filed a brief for respondent International Longshoremen's and Warehousemen's Union.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Section 15 of the Shipping Act, 1916, 39 Stat. 733, as amended, 46 U. S. C. § 814,[1] requires the filing with the

---

*Herbert Rubin, Cecelia H. Goetz,* and *Alan A. D'Ambrosio* filed a brief for Wolfsburger Transport-Gesellschaft m. b. H. as *amicus curiae* urging reversal.

[1] Section 15, as set forth in 46 U. S. C. § 814, provides as follows:

"Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying com-

Federal Maritime Commission (Commission) of seven categories of agreements between a common carrier by water, or "other person subject to this chapter" and another such carrier

petition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term 'agreement' in this section includes understandings, conferences, and other arrangements.

"The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations. No such agreement shall be approved, nor shall continued approval be permitted for any agreement (1) between carriers not members of the same conference or conferences of carriers serving different trades that would otherwise be naturally competitive, unless in the case of agreements between carriers, each carrier, or in the case of agreement between conferences, each conference, retains the right of independent action, or (2) in respect to any conference agreement, which fails to provide reasonable and equal terms and conditions for admission and readmission to conference membership of other qualified carriers in the trade, or fails to provide that any member may withdraw from membership upon reasonable notice without penalty for such withdrawal.

"The Commission shall disapprove any such agreement, after notice and hearing, on a finding of inadequate policing of the obligations under it, or of failure or refusal to adopt and maintain reasonable procedures for promptly and fairly hearing and considering shippers' requests and complaints.

"Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly

or person.[2] Among those agreements that must be filed are those "controlling, regulating, preventing, or destroying competition." The Commission is empowered to "disapprove, cancel, or modify" any such agreement that it finds to be "unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, . . . or to operate to the detriment

---

or indirectly, any such agreement, modification, or cancellation; except that tariff rates, fares, and charges, and classifications, rules, and regulations explanatory thereof (including changes in special rates and charges covered by section 813a of this title which do not involve a change in the spread between such rates and charges and the rates and charges applicable to noncontract shippers) agreed upon by approved conferences, and changes and amendments thereto, if otherwise in accordance with law, shall be permitted to take effect without prior approval upon compliance with the publication and filing requirements of section 817 (b) of this title and with the provisions of any regulations the Commission may adopt.

"Every agreement, modification, or cancellation lawful under this section, or permitted under section 813a of this title, shall be excepted from the provisions of sections 1 to 11 and 15 of Title 15, and amendments and Acts supplementary thereto.

"Whoever violates any provision of this section or of section 813a of this title shall be liable to a penalty of not more than $1,000 for each day such violation continues, to be recovered by the United States in a civil action. *Provided, however,* That the penalty provisions of this section shall not apply to leases, licenses, assignments, or other agreements of similar character for the use of terminal property or facilities which were entered into before the date of enactment of this Act, and, if continued in effect beyond said date, submitted to the Federal Maritime Commission for approval prior to or within ninety days after the enactment of this Act, unless such leases, licenses, assignments, or other agreements for the use of terminal facilities are disapproved, modified, or canceled by the Commission and are continued in operation without regard to the Commission's action thereon. The Commission shall promptly approve, disapprove, cancel, or modify each such agreement in accordance with the provisions of this section."

[2] Section 1 of the Act, as set forth in 46 U. S. C. § 801, defines the term "other person subject to this chapter" as "any person not included in the term 'common carrier by water,' carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water."

of the commerce of the United States, or to be contrary to the public interest . . ." and is directed to approve all filed agreements that do not transgress these standards. Before approval or after disapproval, agreements subject to filing are unlawful and may not be implemented.[3] Agreements that are "lawful under this section" are excepted from those provisions of the antitrust laws contained in §§ 1–11 and 15 of Title 15 of the United States Code. Violations of the section are punishable by civil fines of not more than $1,000 per day.

The issue in this case is whether § 15 of the Shipping Act requires the filing and the Commission's approval or disapproval of a collective-bargaining agreement between respondent Pacific Maritime Association (PMA), a collective-bargaining agent for a multiemployer bargaining unit made up of various employers of Pacific coast dockworkers,[4] and respondent International Longshoremen's and Warehousemen's Union (Union).

## I

This case arose when eight municipal corporations, owners and operators of Pacific coast port facilities and not members of the PMA,[5] filed a petition with the Commission asserting that a 1972 agreement between PMA and the Union was subject to filing and approval under § 15 and was violative of §§ 15, 16, and 17 of the Shipping Act[6] because it was unjust,

---

[3] There are exceptions to this rule, see n. 1, *supra*, not relevant to this case.

[4] PMA's membership includes steamship lines, steamship agents, stevedoring companies, and marine terminal companies operating at Pacific coast ports of the United States.

[5] The complaining public ports were Anacortes, Bellingham, Everett, Grays Harbor, Olympia, Port Angeles, Portland, and Tacoma. The Port of Seattle subsequently intervened on their side.

[6] Section 16, 39 Stat. 734, as amended, 46 U. S. C. § 815, forbids discriminatory or preferential rates or other acts; and § 17, 39 Stat. 734, as

discriminatory, and contrary to the public interest. Prior to this time, the nonmember ports had negotiated separate agreements with the Union which contained terms and conditions that in some respects differed from those contained in the collective-bargaining contracts between PMA and the Union. Fringe-benefit provisions varied, depending on the result of individual negotiations.[7]  In some respects the ports enjoyed more flexible work rules than did PMA; the ports, for example, were often permitted to use "steady crews," whereas, under the PMA contract, rotation of workers among employers was the general rule.[8]  The existence of separate agreements between the Union and the public ports also enabled the Union to exert negotiating pressure on PMA by striking PMA while continuing to work for the individual ports. The ports, nevertheless, were permitted by virtue of separate agreements with PMA to secure their work force through the PMA-Union hiring halls[9] and to make the particular fringe-benefit pay-

---

amended, 46 U. S. C. § 816, empowers the Commission to prescribe reasonable nondiscriminatory rates.

[7] For present purposes, the term "fringe benefits" refers to bargained-for plans for vacation pay, pay guarantees, pensions, welfare, and holidays.

[8] The Union favors the centralized, rotational hiring system, because such a system equalizes job opportunities by insuring that available work is spread among the registered work force. Employers, however, prefer to use steady gangs, believing that system to be more efficient since new workers are not constantly having to be familiarized with the employer's operations.

[9] Since 1935, PMA employers have been required to hire exclusively from hiring halls jointly financed by PMA and the Union. This hiring-hall system was created in an effort to reconcile the fluctuating demand for labor in the Pacific coast longshore industry with the need for stable employment. Union members register for jobs at the halls and from there are dispatched to work assignments. Despite the rotational hiring method used within the industry, registered Union workers receive a single paycheck from PMA. This requires PMA to maintain a central payroll and recordkeeping system for these longshoremen.

ments called for by their individual contracts by contributing to the fringe-benefit funds maintained by PMA.[10]

During contract negotiations between PMA and the Union beginning in November 1970, one of the issues raised was whether nonmembers should continue to be allowed to participate in PMA hiring-hall and fringe-benefit plans. These privileges PMA desired to eliminate.[11] Ultimately, the parties arrived at a Supplemental Memorandum of Understanding described as follows by the court below:

> "In the Supplemental Memorandum the parties agreed that PMA would accept contributions from all nonmembers who executed a uniform participation agreement. This standard agreement, included in the Supplemental Memorandum, would require nonmembers, as a condition of using the joint dispatching halls for jointly registered employees, to participate in all fringe benefit programs, pay the same dues and assessments as PMA members, use steady men 'in the same way a member may do so,' and be treated as a member during work stoppages." 177 U. S. App. D. C. 248, 250–251, 543 F. 2d 395, 397–398 (1976) (footnotes omitted).[12]

---

[10] The ports paid a participation fee for this privilege. In PMA's view, allowing nonmembers to participate in the fringe-benefit plans was a great benefit to the nonmembers, for it permitted them to participate in programs funded for thousands of employees, rather than having to establish their own plans for very few employees. On the other hand, PMA thought that having nonmembers participate in some, but not necessarily all, of the benefit plans created additional administrative burdens for it.

[11] When contract negotiations began in late 1970, the Union proposed that the contract provide that PMA would accept all fringe-benefit contributions from any employer, whether or not a PMA member. In response PMA proposed that all nonmember participation under the collective-bargaining agreement be eliminated except as applied to those employers who were not permitted by law to become members of PMA.

[12] To support this description, the Court of Appeals quoted the following paragraphs from a revision of the Supplemental Memorandum of

It was this agreement that the public ports asserted was subject to filing and Commission action under § 15.

In October 1972, the Commission severed for initial deter-

---

Understanding, to be mentioned in the text, which the Commission found was substantially the same as the Supplemental Memorandum of Understanding, 177 U. S. App. D. C., at 250–251, nn. 6–9, 543 F. 2d, at 397–398, nn. 6–9:

"6. 7. The nonmember participant shall participate in the ILWU–PMA Pension Plan, the ILWU–PMA Welfare Plan, the PMA Vacation Plans (longshoremen and clerks, and walking bosses/foremen) and the ILWU–PMA Guarantee Plans (longshoremen and clerks/ and walking bosses/foremen) in accordance with the terms applicable to such participation. Such nonmember shall make payments into these Plans at the same rates and at the same times as members of PMA are to make the respective payments. Attached are statements of terms and conditions currently in effect with respect to such participation. Non-member Participants shall be subject to the same audits as members of PMA."

"7. 9. Each nonmember participant shall pay to the PMA an amount equal to the dues and assessments on the same basis that a PMA member would pay. Payments shall be made at the same time the member would pay."

"8. 5. A nonmember participant may obtain and employ a man in the joint work force on a steady basis in the same way a member may do so. When such participant employs a man to work on a steady basis, it shall notify PMA immediately. On request from PMA, each such participant shall furnish to PMA a list of men it is using on a steady basis. Steady men shall participate in the Pay Guarantee Plan in accordance with the rules that are adopted by PMA and ILWU."

"9. 3. A nonmember participant will share in the use of the joint work force upon the same terms as apply to members of PMA. For example

"a) the nonmember participant shall obtain men on the same basis as a PMA member from the dispatch hall operated by ILWU and PMA through the allocation system operated by PMA,

"b) if a work stoppage by ILWU shuts off the dispatch of men from the dispatch hall to PMA members, nonmember participants shall not obtain men from the dispatch hall,

"c) if during a work stoppage by ILWU, PMA and ILWU agree on limited dispatch of men from the dispatch hall for PMA members, such limited dispatch shall be available to nonmember participants.

"The essence of b) and c) of this section is the acceptance by nonmem-

mination the issues of its jurisdiction over the challenged agreement, and, if the Supplemental Memorandum of Understanding was otherwise covered by § 15, whether there were considerations rooted in the national labor policy that would nevertheless exempt the agreement from the filing and approval requirements of the section. Thereafter, on June 24, 1973, PMA and the Union arrived at a new collective-bargaining agreement, which included a revised nonmember participation agreement replacing the Supplemental Memorandum of Understanding. By additional order, the Commission extended its jurisdictional inquiry to include the new contract with its nonmember participation provisions, which, although revised, were deemed by the Commission to have essentially the same impact for present purposes as the Supplemental Memorandum of Understanding.

In its subsequent report and order, *Pacific Maritime Assn.—Cooperative Working Arrangements,* 18 F. M. C. 196 (1975), the Commission first rejected the suggestion that because the case called for accommodating the Shipping Act and the labor statutes, as well as determining whether the parties had exceeded the scope of legitimate bargaining, the Commission should not itself decide the issue but should defer to the courts or to the National Labor Relations Board.[13] The Com-

ber participants of the principle that a work stoppage by ILWU against PMA members is a work stoppage against nonmember participants."

The Court of Appeals went on to point out:

"The Revised Agreement also required uniform terms regarding selection of men in the joint work force, continuance of obligation to pay PMA assessments, and use of uniform payment and record forms." *Id.,* at 251 n. 9, 543 F. 2d, at 398 n. 9.

[13] The Commission noted that the complaint before it alleged, not that PMA or the Union had refused to bargain, but rather that they had entered into an agreement in violation of the shipping and antitrust laws. The Commission concluded that the NLRB would be without available procedure to investigate the legality of the nonmember participation agreement.

The suggestion that it defer the matter to the courts was also deemed

mission also rejected the argument, as it had rejected similar arguments in *New York Shipping Assn.—NYSA–ILA Man-Hour/Tonnage Method of Assessment,* 16 F. M. C. 381 (1973), aff'd, 495 F. 2d 1215 (CA2), cert. denied, 419 U. S. 964 (1974), that § 15's filing requirement was not triggered because some members of PMA were neither carriers nor "other persons subject to the act" or because PMA's contract was with a labor union, which also was neither a carrier nor "other person." [14]   The Commission went on to find that the purpose of the nonmember participation agreement was to place non-members on the same competitive basis as members of the PMA and that its effect was to control or affect competition between members and nonmembers.   The Commission concluded that the agreement was thus subject to filing and approval or disapproval under § 15, unless, because it was part of a collective-bargaining contract, it fell within that category of contracts that the national labor policy placed beyond the reach of the Shipping Act.   The Commission had recognized this so-called "labor exemption" in *United Stevedoring Corp.* v. *Boston Shipping Assn.,* 16 F. M. C. 7 (1972), and it pro-

unmeritorious, since the Commission had already intervened in a counterpart antitrust case brought by the ports and had requested a stay of those proceedings, which had been granted pending the Commission's resolution of the Shipping Act questions.

[14] The Commission's view is that, although the Union is neither a carrier nor "other person," the agreement nevertheless constitutes an agreement among the contracting carriers—in this case as to how the public ports were to be dealt with—and is therefore a § 15 contract insofar as the identity of the parties is concerned.   The Court of Appeals for the Second Circuit agrees with the Commission.   *New York Shipping Assn.* v. *FMC,* 495 F. 2d 1215, 1220–1221, cert. denied, 419 U. S. 964 (1974).   Nor did the Court of Appeals in this case disagree; it simply noted the approach of the Commission and suggested that this Court might have approved it in *Volkswagenwerk* v. *FMC,* 390 U. S. 261 (1968).   177 U. S. App. D. C., at 261 n. 31, 543 F. 2d, at 408 n. 31.

ceeded to adjudicate the status of the instant agreement under the criteria annnounced in that case.[15]

The Commission's ultimate conclusion was that the nonmember participation agreement was not entitled to exemption from filing under § 15, primarily because its thrust was to

---

[15] The Commission said, 16 F. M. C., at 12–13:

"Hence, from these cases have evolved the various criteria for determining the labor exemption from the antitrust laws and which we herewith adopt for purposes of assisting us in determining the labor exemption from the shipping laws with this caveat. These criteria are by no means meant to be exclusive nor are they determinative in each and every case. Just as in the accommodation of the labor laws and the antitrust laws the courts have resolved each case on an ad hoc basis, so too will we. Each of the following criteria deserves consideration, but it is obvious that each element is not in and of itself controlling. They are rather guidelines or 'rules of thumb' for each factual situation. These criteria are as follows:

"1. The collective bargaining which gives rise to the activity in question must be in good faith. Other expressions used to characterize this element are 'arms-length' or 'eyeball to eyeball.'

"2. The matter is a mandatory subject of bargaining, e. g. wages, hours or working conditions. The matter must be a proper subject of union concern, i. e., it is intimately related or primarily and commonly associated with a bona fide labor purpose.

"3. The result of the collective bargaining does not impose terms on entities outside of the collective bargaining group.

"4. The union is not acting at the behest of or in combination with nonlabor groups, i. e., there is no conspiracy with management.

"In the final analysis, the nature of the activity must be scrutinized to determine whether it is the type of activity which attempts to affect competition under the antitrust laws or the Shipping Act. The impact upon business which this activity has must then be examined to determine the extent of its possible effect upon competition, and whether any such effect is a direct and probable result of the activity or only remote. Ultimately, the relief requested or the sanction imposed by law must then be weighed against its effect upon the collective bargaining agreement. In balancing the equities, the above criteria will no doubt be of value. We cannot, however, subscribe to the view that collective bargaining agreements be granted a blanket labor exemption from the Shipping Act."

bring nonmembers into parity with members by requiring employers outside the bargaining unit to submit to bargaining-unit terms. The result had "a potentially severe and adverse effect upon competition," 18 F. M. C., at 208, and only a superficial effect on the collective-bargaining process. The agreement was thus subject to filing and approval under § 15.

The Court of Appeals for the District of Columbia Circuit set aside the Commission's order, holding that the disputed agreement was wholly beyond the Commission's jurisdiction under § 15. 177 U. S. App. D. C. 248, 543 F. 2d 395 (1976). The Commission's approach, which extends to labor agreements an exemption from Shipping Act requirements roughly equivalent to the exemption from the antitrust laws that the courts hold the labor statutes require for collective-bargaining contracts, was deemed an inadequate response to the demands of the national labor policy. Without disturbing the Commission's conclusion that the purpose and effect of the nonmember participation agreement at issue here were "to control or affect competition between members and nonmembers," 18 F. M. C., at 201, and hence that it was within the literal terms of § 15, and without holding that the agreement would qualify for an antitrust exemption under the relevant cases, the Court of Appeals ruled that *any* collective-bargaining contract, whatever its impact on competition, was exempt from filing with the Commission. Alternatively, the Court of Appeals held that, even if its *per se* rule excluding collective-bargaining agreements from the reach of § 15 was infirm, the Commission had erred in refusing to exempt from filing the particular nonmember participation agreement in question here.

We granted the petition for certiorari filed by the United States and the Commission, 430 U. S. 905 (1977), which raises two issues: whether the national labor policy requires exempting collective-bargaining contracts as a class from the filing

requirements of § 15 and, if not, whether the agreement at issue here is nevertheless exempt from those requirements.

## II

We cannot agree with the holding below that, whatever their effect on competition might be, collective-bargaining contracts are categorically exempt from the filing requirements of § 15 of the Shipping Act. Section 15 on its face reaches any contract between carriers "controlling, regulating, preventing, or destroying competition." If a contract is of that nature, it is within the reach of § 15 and subject to the Commission's jurisdiction, and it is quite untenable to suggest that collective-bargaining contracts *never* control, regulate, prevent, or destroy competition. See *Mine Workers* v. *Pennington,* 381 U. S. 657 (1965); *Allen Bradley Co.* v. *Electrical Workers,* 325 U. S. 797 (1945). If subject to § 15, a filed agreement must be approved by the Commission unless it is discriminatory or unfair, operates to the detriment of the commerce of the United States, or is contrary to the public interest. Because § 15 provides that an approved agreement will not be subject to the antitrust laws, it is apparent that Congress assigned to the Commission, not to the courts, the task of initially determining which anticompetitive restraints are to be approved and which are to be disapproved under the general statutory guidelines. It is equally apparent that as a substantive matter, Congress anticipated that various anticompetitive restraints, forbidden by the antitrust laws in other contexts, would be acceptable in the shipping industry.

That the Commission is the public arbiter of competition in the shipping industry is reflected in prior holdings that in reaching its decision under § 15 the Commission *must* "consider the antitrust implications of an agreement before approving it," *FMC* v. *Seatrain Lines, Inc.,* 411 U. S. 726, 739 (1973), and should approve an anticompetitive agreement only if it is " 'required by a serious transportation need, neces-

sary to secure important public benefits or in furtherance of a valid regulatory purpose of the Shipping Act.' " *FMC* v. *Svenska Amerika Linien,* 390 U. S. 238, 243 (1968). The Commission, nevertheless, may approve agreements "even though they are violative of the antitrust laws . . . ." *Seatrain, supra,* at 728.

The removal of the task of initially overseeing private restraints on competition from the regime of the antitrust laws and the courts is not a historical anachronism that we are entitled to ignore. Congress responded to *Federal Maritime Board* v. *Isbrandtsen Co.,* 356 U. S. 481 (1958), which held that a particular system of dual rates adopted by a shipping conference violated § 14 of the Shipping Act, by suspending the effect of that decision pending full study and permanent legislation. After extensive investigation, important amendments were forthcoming in 1961, Pub. L. 87–346, 75 Stat. 763; but the Act's basic approach—that the regulation of competition in the shipping industry is to be an administrative function, subject to judicial review—was reaffirmed. Indeed, § 15 was amended "by enlarging and clarifying the [Commission's] powers over agreements filed thereunder" by, among other things, the addition of the public interest standard to § 15. H. R. Rep. No. 498, 87th Cong., 1st Sess., 17–18 (1961). Section 15 was declared by the Antitrust Subcommittee of the House Judiciary Committee, which undertook a three-year study of "the entire gamut of antitrust problems in the ocean freight industry . . . ," to be "the heart of the Shipping Act." H. R. Rep. No. 1419, 87th Cong., 2d Sess., 2, 15 (1962).

It is appropriate, therefore, that the Court has recognized the broad reach of § 15 and resisted improvident attempts to narrow it. In *Volkswagenwerk* v. *FMC,* 390 U. S. 261 (1968), a collective-bargaining agreement between PMA and the Union included a provision requiring PMA to create a sizable fund to be used to mitigate the impact of technological unemployment upon employees. PMA reserved the right to

determine how the fund was to be raised, and thereafter it settled upon a particular method by which its members would contribute to the fund. The issue then arose whether this latter agreement was within the Commission's jurisdiction under § 15. The Commission held that, although the assessment formula arrived at was within the literal language of the section, it was exempt from filing since § 15 should be applied only to those agreements that affect competition among the carriers in their dealings with the shipping and traveling public.[16] The Court of Appeals affirmed; but we reversed, rejecting the Commission's "extremely narrow view of a statute that uses expansive language." 390 U. S., at 273. In response to the Commission's expressed desire to read § 15 narrowly in order to minimize the antitrust exemption, we noted that "antitrust exemption results, not when an agreement is submitted for filing, but only when the agreement is actually approved . . . ," 390 U. S., at 273, and that "in deciding whether to approve an agreement, the Commission is required under § 15 to consider antitrust implications." *Id.*, at 273–274. Hence, "[t]o limit § 15 agreements that 'affect competition,' as the Commission used that phrase . . . simply [did] not square with the structure of the statute," *id.*, at 275, and "would [render] virtually meaningless" major parts of § 15's filing provisions. 390 U. S., at 275 n. 23.

Because *Volkswagenwerk* dealt only with the agreed-upon assessment formula, the Court noted that no question had been raised about the validity of the underlying collective-bargaining contract. The opinion does not, therefore, determine one way or the other whether collective-bargaining contracts are ever within the reach of § 15; but the Court did

---

[16] The Commission concluded that the agreement in question did not affect "outsiders" because there was no express agreement among the PMA members to pass on all or a portion of the assessments to the carriers and shippers served by the terminal operators. *Volkswagenwerk Aktiengesellschaft* v. *Marine Terminals Corp.,* 9 F. M. C. 77, 82–83 (1965).

56

emphasize the breadth of the statutory language and the determination of Congress, reflected in § 15, to "subject to the scrutiny of a specialized governmental agency the myriad of restrictive agreements in the maritime industry." 390 U. S., at 276. At the very least, the opinion counsels against implying broad exemptions for agreements, collective-bargaining contracts or otherwise, whose impact on competition is "neither *de minimis* nor routine." *Id.*, at 277.

In the present case, the Court of Appeals' removal from the Commission's jurisdiction of all collective-bargaining contracts, regardless of how anticompetitive they might be, and whether or not exempt under the antitrust laws, would appear to be contrary to the plain terms of § 15. The Court of Appeals was not unaware that it was depriving the Commission of the power to approve or disapprove anticompetitive contracts that § 15 on its face clearly confers, but it thought its holding necessary to implement the collective-bargaining system established by the federal statutes dealing with labor-management relations, including those in the shipping industry. While there is no doubt that the courts must give all due effect to each of two seemingly overlapping statutes, we think the Court of Appeals misconceived its task here.

The principal objection to Commission jurisdiction over *any* bargaining agreement was that under § 15 agreements subject to filing cannot be implemented *prior* to approval or after disapproval. This alone was enough to exempt collective-bargaining contracts from filing under § 15, for, as the Court of Appeals understood the collective-bargaining system mandated by the National Labor Relations Act, one of its essential elements is for the parties to be legally free "to implement promptly the compromise agreements worked out in eleventh-hour bargaining sessions . . . ." 177 U. S. App. D. C., at 259, 543 F. 2d, at 406. Subjecting negotiated labor agreements to filing and approval "would make nearly impossible the maintenance or prompt restoration of industrial peace." *Ibid.*

Prompt implementation of lawful collective-bargaining agreements is indeed an important consideration, but the fears of the Court of Appeals as to the possible impact of the Commission's decision on the collective-bargaining process are exaggerated and do not justify the major surgery performed on § 15 by the decision below. In the first place, the Commission's decision would not require the filing of all or even most of the collective-bargaining contracts entered into in the shipping industry. Because § 15 applies only to agreements between at least two parties subject to the Act, see n. 1, *supra,* collective-bargaining contracts between the Union and a single employer would not have to be filed. Moreover, not all collective-bargaining agreements between the Union and PMA would be subject to the requirements of § 15. Under § 15, filed agreements must be approved unless they operate to the detriment of commerce, are contrary to the public interest, or otherwise fail to satisfy the specified standards. Under these standards, it would be difficult to conclude that ordinary collective-bargaining agreements establishing wages, hours, and working conditions in a bargaining unit could or would be disapproved as contrary to the public interest or detrimental to commerce. Such contracts are the product of bargaining compelled by the labor laws, which themselves were enacted pursuant to the power of Congress to regulate commerce in the public interest. They are also the kind of contracts that the courts, because of the collective-bargaining regime established by the labor laws, in the main have declared to be beyond the reach of the antitrust laws, the statutes specifically designed to protect the commerce of the United States from anticompetitive restraints.

The Commission has recognized that the vast majority of collective-bargaining arrangements cannot be deemed candidates for disapproval under § 15 and that they would be routinely approved even if filed. Consistent with its power under § 35 of the Shipping Act, 39 Stat. 738, as added, 80 Stat.

1358, 46 U. S. C. § 833a, in appropriate circumstances to exempt from § 15 filing requirements "any class of agreements between persons subject to this chapter or any specified activity of such persons . . . ,"[17] the Commission, by adjudication, has determined that it will recognize a "labor exemption" from the filing requirements of § 15 for collective-bargaining contracts falling within the boundaries of the exemption defined by its announced criteria.[18]   In doing so, the Commission has been guided by its understanding of our cases, and those of other courts, that recognize and define an exemption from the antitrust laws for certain contracts between management and labor.   It appears to be the intention of the Commission to exercise jurisdiction over only those collective-bargaining contracts that in its view would not be exempt from examination under antitrust laws and that should be reviewed under Shipping Act standards.   We therefore doubt that the Commission's decision will have a broad impact on labor-management relations.   At least, it has not been demonstrated at this juncture that the collective-bargaining concerns cited by the Court of Appeals are sufficient to require complete exemption for labor agreements and the consequent partial emasculation of the statutory scheme for administrative review of anticompetitive agreements.

---

[17] Section 35, as set forth in 46 U. S. C. § 833a, provides:

"The Federal Maritime Commission, upon application or on its own motion, may by order or rule exempt for the future any class of agreements between persons subject to this chapter or any specified activity of such persons from any requirement of this chapter, or Intercoastal Shipping Act, 1933, where it finds that such exemption will not substantially impair effective regulation by the Federal Maritime Commission, be unjustly discriminatory, or be detrimental to commerce.

"The Commission may attach conditions to any such exemptions and may, by order, revoke any such exemption.

"No order or rule of exemption or revocation of exemption shall be issued unless opportunity for hearing has been afforded interested persons."

[18] See n. 15, supra.

Second, the Commission, in any event, claims the authority, which it has exercised, see *New York Shipping Assn.—NYSA–ILA Man-Hour/Tonnage Method of Assessment,* 16 F. M. C. 381 (1973), aff'd, 495 F. 2d 1215 (CA2), cert. denied, 419 U. S. 964 (1974), to issue conditional approval of filed agreements pending final decision as to their legality; and it is not clear why this mechanism is not amply responsive to the fears of undue delay or why its adequacy should now be debated since the parties could have, but did not, request early, conditional approval. The Court of Appeals did not deny that the Commission could permit implementation of filed agreements prior to a final decision, but it thought the mechanism only a partial alleviation of the problem since the parties still would face the "specter" of a later administrative invalidation of perhaps a crucial part of a collective-bargaining contract. But it is not immediately obvious why provisions of a collective-bargaining contract that appear obviously illegal to the Commission should be immediately implemented pending final decision. Furthermore, if a collective-bargaining contract having serious anticompetitive aspects is not subject to filing under § 15, as the Court of Appeals would have it, the parties would in any event face the uncertainty of possible invalidation and of treble damages after long and difficult litigation in an antitrust court. At least under § 15, it would be possible that an anticompetitive collective-bargaining contract that would not survive scrutiny under the antitrust laws could be approved by the Commission, if it served important regulatory goals, and hence would be insulated from antitrust attack. Indeed, a critical aspect of the regulatory plan devised by Congress is the requirement of administrative judgment with respect to all of the specified contracts required to be filed. It was therefore error for the Court of Appeals to hold that the legality of collective-bargaining contracts, challenged as anticompetitive and nonexempt, must be judicially determined under the antitrust laws without interposition of the admin-

istrative judgment and without regard for Shipping Act considerations.

## III

The Court of Appeals also ruled that even absent a blanket exemption from § 15 for collective-bargaining agreements, the Commission should not have exercised § 15 jurisdiction in this case but should have exempted the nonmember participation agreement from filing. In doing so, the court appeared to disagree with the Commission's weighing of the impact on shipping interests of holding the agreement exempt against the impact on collective-bargaining interests of requiring filing and approval under § 15. Perhaps because under the Act this kind of comparison must be the business of the Commission if all collective agreements are not exempt, the Court of Appeals offered little to support this alternative judgment. It suggested that the Commission had failed ∙to realize that the nonmember participation agreement in the last analysis was merely an effort to force the public ports into a multiemployer bargaining unit against their will, an issue clearly within the National Labor Relations Board's authority and one in which the Commission should not intermeddle. The argument is wide of the mark. The Commission has not challenged the power of the Board to determine bargaining units; neither the Commission nor the parties have authority to change a unit certified by the Board. Rather than relying on the Board to resolve any bargaining-unit problem, if there was one, PMA and the Union agreed to impose bargaining-unit terms on employers outside the unit.

Furthermore, the Court of Appeals recognized that the "Supreme Court has ruled against primary jurisdiction in the NLRB for anticompetitive agreements," 177 U. S. App. D. C., at 263, 543 F. 2d, at 410, but went on to conclude that we had removed from all primary administrative cognizance the entire question of accommodating collective-bargaining considerations and the public interest in competition. We doubt that our

opinions should be so broadly read. Congress has not authorized the NLRB to police, modify, or invalidate collective-bargaining contracts aimed at regulating competition or to insulate bargaining agreements from antitrust attack. But here, as we have said, Congress took the different course of committing to the Commission the initial task of approving or disapproving all agreements that control, regulate, prevent, or destroy competition. However much the courts might consider this to be a judicial function, particularly when it is necessary to accommodate the possibly conflicting policies of the labor and shipping laws, we have no warrant to ignore congressional preferences written into § 15 of the Shipping Act.

## IV

Although the Court of Appeals did not otherwise challenge the content or application of the Commission's guidelines for resolving issues as to its jurisdiction over collective-bargaining agreements, the respondents urge that the Commission has misread the relevant cases. In particular, they fault the Commission's findings with respect to the competitive impact of the nonmember participation agreement and the failure to find that the terms under challenge constituted serious antitrust violations. These submissions are unsound. It is plain from our cases that an antitrust case need not be tried and a violation found before a determination can be made that a collective-bargaining agreement is not within the labor exemption, just as it is clear that denying the exemption does not mean that there is an antitrust violation.[19] Insofar as the asserted exemption for collective-bargaining contracts is con-

---

[19] In *Connell Construction Co.* v. *Plumbers & Steamfitters*, 421 U. S. 616 (1975), for example, the Court, after concluding that the agreement in question was not entitled to the nonstatutory labor exemption from the antitrust laws, remanded for consideration whether the agreement violated the Sherman Act. See also *Meat Cutters* v. *Jewel Tea Co.*, 381 U. S. 676, 688–689 (1965) (opinion of WHITE, J.).

cerned, the Commission found all it needed to find to assume jurisdiction and proceed with the case under § 15 when it concluded that PMA and the Union had undertaken to impose employment terms and conditions on employers outside the bargaining unit. As we have previously observed:

> "[T]here is nothing in the labor policy indicating that the union and the employers in one bargaining unit are free to bargain about the wages, hours and working conditions of other bargaining units or to attempt to settle these matters for the entire industry."

> "[A] union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units." *Mine Workers* v. *Pennington,* 381 U. S., at 665–666.

Here, both the Commission and the Court of Appeals understood the nonmember participation agreement to require nonmembers to participate in all fringe-benefit plans agreed upon between the PMA and the Union, to observe PMA-determined labor policies in the event of a work stoppage, and to observe the same work rules with respect to the hiring-hall work force. The result, the Commission found, would be higher costs for nonmembers and the elimination of what the PMA considered to be "a competitive disadvantage" to its members.[20] Accordingly, the Commission was warranted in finding that "the purpose of the supplemental agreement

---

[20] The PMA thought that the nonmembers enjoyed an advantage in that they were able to "pick and choose fringe benefits on a piecemeal basis . . . [and could] get favored treatment in regard to the utilization of the workforce, the employment of steady men, the privilege of working when members [could not], and [that the nonmembers] even [went] so far as to take advantage of that latter situation and handle cargo which would otherwise be handled by members during strike or stoppage periods." App. 102.

[was] . . . to place nonmembers on the same 'competitive' basis as members of the PMA." 18 F. M. C., at 201.

We are thus unpersuaded that the Commission did not make the requisite findings to sustain its view. Nor are we impressed with other arguments that in one guise or another are contentions that the Commission, for lack of ability and experience, should not purport to deal with any collective-bargaining agreement but should leave the entire matter of anticompetitive labor-management contracts to the courts and the antitrust laws. As we have said, Congress has made the Commission the arbiter of competition in the shipping industry; and if there are labor agreements so anticompetitive that they are vulnerable under the antitrust laws, it is difficult to explain why the Commission should not deal with them in the first instance and either approve or disapprove them under the standards specified in § 15.

In summary, we think the Commission was true to § 15 and that it has also demonstrated its sensitivity to the national labor policy by exempting from the filing requirements all collective-bargaining contracts that in its view would also be exempt from the antitrust laws. Because the Commission also has the power to approve filed agreements, even though anticompetitive, the Commission may also take into account any special needs of labor-management relationships in the shipping industry. We should add that since the Shipping Act contains its own standards for exempting and for approving and disapproving agreements between carriers, and because the ultimate issue in cases such as this is the accommodation of the Shipping Act and the labor laws, rather than the labor laws and the antitrust laws, it will not necessarily be a misapplication of the statutes if the exemption for collective-bargaining contracts from Shipping Act requirements is not always exactly congruent with the so-called labor exemption from the antitrust laws as understood by the courts.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

MR. JUSTICE POWELL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

The Court today holds that collective-bargaining agreements in the maritime industry are subject to the filing and prior approval requirements of § 15 of the Shipping Act, 1916 (Act), 46 U. S. C. § 814. Neither statutory language nor legislative history offers specific support for this result. For well over a half a century, the agency responsible for enforcing the Act did not consider § 15 previews of maritime labor contracts to be within its mission,[1] even though collective

[1] Prior to 1968, the Federal Maritime Commission (Commission) and its predecessors resisted the idea that § 15 reached agreements affecting employer-employee relationships. Three years after this Court's ruling in *Volkswagenwerk* v. *FMC*, 390 U. S. 261 (1968), however, the Commission held that § 15 applied to work-gang allocation and employee-recall provisions developed among members of a multiemployer association. The recall provision had been embodied in a collective-bargaining agreement. *United Stevedoring Corp.* v. *Boston Shipping Assn.*, 15 F. M. C. 33 (1971). On appeal, the United States, as statutory respondent, incorporating the positions of the Department of Labor and the National Labor Relations Board, objected to the Commission's decision. The opposition of the United States prompted the Commission to move for a remand for further consideration. The Court of Appeals granted the motion, expressing "astonishment" at the Commission's failure to recognize the difference "between attaching a separate, Section 15, agreement, in which the union had little interest, to a collective bargaining agreement, and making a multiemployer agreement with a union, eyeball to eyeball, but which, by the very fact that it is multi-employer, has some effect on employer competition." *Boston Shipping Assn.* v. *United States*, 8 SRR 20,828, 20,830 (CA1 1972). On remand, the Commission found that both provisions were entitled to a "labor exemption" derived, by analogy, from this Court's labor-

bargaining is hardly a recent development in the major ports of the Nation.[2] No intervening legislation explains the Court's willingness to recognize this belated assertion of jurisdiction.[3]

This decision would be debatable but unexceptional were it not for the presence of a competing statute. The task confronting the Court is one of reconciling the broad language of § 15 with the distinct policy of federal labor law embodied in the Labor Management Relations Act, 1947, 29 U. S. C. § 141 *et seq.* It seems to me that today's ruling undercuts federal labor policy, imposing undue burdens on collective bargaining, without advancing significantly any Shipping Act objective. I therefore dissent.

---

antitrust decisions. *United Stevedoring Corp.* v. *Boston Shipping Assn.,* 16 F. M. C. 7, 14–15 (1972).

Aside from the present controversy, the Commission's only other foray into the labor arena involved an assessment formula for funding a fringe-benefit program that was incorporated in a collective-bargaining agreement. *New York Shipping Assn.—NYSA–ILA Man-Hour/Tonnage Method of Assessment,* 16 F. M. C. 381 (1973). On appeal, the United States supported the Commission, while the Department of Labor and the National Labor Relations Board urged reversal. The Court of Appeals upheld the decision. *New York Shipping Assn.* v. *FMC,* 495 F. 2d 1215 (CA2), cert. denied, 419 U. S. 964 (1974).

[2] New York longshoremen were sufficiently organized by 1874 to conduct a five-week strike for higher wages. By 1914, New York locals formed the International Longshoremen's Association (ILA) and, by 1916, the union secured a portwide agreement. On the west coast, District Council 38 of the ILA, in 1915, entered into an agreement providing for wage increases with all employers in the Puget Sound-British Columbia area. C. Larrowe, Shape-Up and Hiring Hall 7–9, 87–89 (1955).

[3] The Court notes that the Shipping Act, including § 15, was extensively revised in 1961, Pub. L. 87–346, 75 Stat. 763, see *ante,* at 54, but offers no evidence that this re-examination of "the entire gamut of antitrust problems in the ocean freight industry," H. R. Rep. No. 1419, 87th Cong., 2d Sess., 2 (1962), touched upon the possibility of § 15's application to collective-bargaining agreements.

## I

The sweeping generality of § 15 arguably would enable the statute to be applied to almost any agreement involving a party subject to the Act. But this merely accents the importance of construing its general language in light of the Act's purposes and the policies of other pertinent statutes. Section 15 has not been interpreted as reaching all agreements related to maritime transportation. See *FMC* v. *Seatrain Lines, Inc.*, 411 U. S. 726, 731–734 (1973). Although *Volkswagenwerk* v. *FMC*, 390 U. S. 261 (1968), referred to today, *ante*, at 55–56, emphasized the breadth of the statutory language, the Court was careful to limit its holding to avoid any suggestion that collective-bargaining agreements must comply with the requirements of § 15.

In subjecting collective-bargaining agreements to prior clearance by the Commission under § 15, the Court goes well beyond the limits established in *Volkswagenwerk*. There, an earlier agreement between respondent Pacific Maritime Association (PMA) and respondent International Longshoremen's and Warehousemen's Union (Union) provided for the introduction of laborsaving devices and the elimination of certain work practices. The agreement required the creation of a "Mechanization and Modernization Fund" (Mech Fund) of $29 million to be used to mitigate the impact of technological unemployment upon employees. It reserved to the PMA alone the right to determine how to raise the fund from its members. The question before the Court was whether § 15 applied to a *subsequent* agreement among members of the PMA setting forth various formulas for collecting the Mech Fund. The Court held that the employers' "side agreement" would have a substantial impact on stevedoring and terminal charges, and required the prior approval of the Commission. Following the suggestion of the United States,[4] the Court

---

[4] "For purposes of deciding this case, we may assume that agreements which relate solely to collective bargaining or labor relations are excepted from the scope of Section 15 of the Shipping Act. Cf. *Kennedy* v. *Long*

restricted its holding to the "side agreement," explicitly disclaiming any intention to reach the underlying collective-bargaining agreement.

> "It is to be emphasized that the only agreement involved in this case is the one among members of the Association allocating the impact of the Mech Fund levy. We are not concerned here with the agreement creating the Association or with the collective bargaining agreement between the Association and the ILWU. No claim has been made in this case that either of those agreements was subject to the filing requirements of § 15. *Those agreements, reflecting the national labor policy of free collective bargaining by representatives of the parties' own unfettered choice, fall in an area of concern to the National Labor Relations Board, and nothing we have said in this opinion is to be understood as questioning their continuing validity.* But in negotiating with the ILWU, the Association insisted that its members were to have the exclusive right to determine how the Mech Fund was to be assessed, and a clause to that effect was included in the collective bargaining agreement. That assessment arrangement, affecting only relationships among Association members and their customers, is all that is before us in this case." 390 U. S., at 278 (emphasis supplied).

---

*Island R. Co.,* 211 F. Supp. 478 (S. D. N. Y.), affirmed, 319 F. 2d 366 (C. A. 2), certiorari denied, 375 U. S. 830. *The basic agreement to provide a mechanization fund in a certain amount for the benefit of the longshoremen would appear to be of this character.* And after the Association agreed to create the fund it had an ancillary obligation to collect it somehow. But at issue here is only the side agreement among the Association's members prescribing a special assessment on the cargo handled by them. Such an agreement among employers apportioning the cost of the labor contract is not a part of that contract, involves no question of labor relations, and is not subject to the jurisdiction of the Labor Board." Brief for United States in *Volkswagenwerk* v. *FMC,* O. T. 1967, No. 69, pp. 31–32 (emphasis supplied); see Memorandum for United States in *Volkswagenwerk,* pp. 7–8.

The italicized language makes clear that the *Volkswagenwerk* Court perceived a distinction, material to Commission authority under § 15, between a collective-bargaining agreement, and implementing agreements among carriers, stevedoring contractors, and marine terminal operators.

In this case, I would follow what seems to have been the lead of the Court in *Volkswagenwerk*. A proper accommodation of the conflicting signals of the Shipping Act and federal labor policy requires that bona fide collective-bargaining agreements, arrived through arm's-length negotiations,[5] do not fall within § 15. As in other collective-bargaining contexts, labor and management in the maritime industry would be free to reach agreement without prior Government approval or control over the substantive terms of the bargain, while the agreement itself or its implementation would be subject to scrutiny under the antitrust laws and the specific prohibitions of §§ 16 [6] and 17 [7] of the Act.

---

[5] Petitioners do not challenge the bona fides of the agreement in question. Indeed, they concede that the Union has a legitimate interest in the integrity and work opportunities of the registered work force and in the fringe benefits covered by the agreement. Reply Brief for Petitioners 6.

[6] Section 16 of the Act, as set forth in 46 U. S. C. § 815, provides in relevant part:

"It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—

"First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever . . . ."

See n. 16, *infra*.

[7] Section 17 of the Act, as set forth in 46 U. S. C. § 816, provides in relevant part:

"Every such carrier and every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or

## II

The prospects for peaceful resolution of labor disputes in an industry marked by a history of industrial strife, see C. Larrowe, Shape Up and Hiring Hall 1–48, 83–138 (1955); *Volkswagenwerk* v. *FMC*, 390 U. S., at 296–299 (Douglas, J., dissenting in part), are not enhanced by the Court's imposition of a system of administrative prior restraints. Collective bargaining works best when the parties are free to arrive at negotiated solutions to problems without first having to secure the approval of Government regulators. The legal consequences of a bargain may be assessed after the fact, but the parties should be free to negotiate an agreement within the framework of procedures prescribed by the National Labor Relations Board (Board). Often negotiations are conducted under substantial constraints of time, and agreement is reached at the eleventh hour. If there is no agreement by the expiration date of the previous contract, or if an accord may not be executed because of a requirement of prior governmental approval, labor's "no contract, no work" tradition suggests the likelihood of a disruptive work stoppage. Moreover, the bargaining process itself may suffer where the parties know that any agreement is simply a tentative accord, subject to pre-implementation review by an administrative agency. As the Board noted in *New York Shipping Assn.* v. *FMC*, 495 F. 2d 1215 (CA2), cert. denied, 419 U. S. 964 (1974):

> "It is extremely difficult for the parties to make a meaningful judgment as to the kind of bargain they are negotiating if one or more of the key provisions on which agreement turns is subject to invalidation by the Com-

---

delivering of property. Whenever the Commission finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice." This provision may not reach the collective-bargaining agreement, but it would appear to be applicable to the implementation of the agreement by persons subject to the Act.

mission. This kind of administrative supervision will impede the process of collective bargaining and could inhibit negotiators' attempts to arrive at novel solutions to troublesome labor problems. The superimposition of the approval of the FMC over '[matters that are] crucial to the agreement is likely to disrupt the process of collective bargaining and deter the speedy resolution of industrial disputes in the maritime industry." Brief for National Labor Relations Board as *Amicus Curiae* in Nos. 73–1919 and 73–1991 (CA2), p. 14.

Section 15 jurisdiction also entails recognition of a revisory power in the Commission over the substantive terms of collective-bargaining agreements. The Commission is empowered, after notice and hearing, to "disapprove, cancel or modify any agreement" that it finds to be "unjustly discriminatory or unfair," detrimental to commerce, contrary to the public interest, or otherwise violative of the Act. If—as the Court holds—this power is applicable to collective-bargaining agreements, it would exceed even the broad remedial authority of the Board itself, which falls short of any substantial interference with the "freedom of contract" of the parties. In *Porter Co.* v. *NLRB,* 397 U. S. 99 (1970), the Court held that the Board could not order an employer to grant the union a contract checkoff clause as a remedy for an acknowledged violation of the statutory duty to bargain in good faith.

"It is implicit in the entire structure of the Act that the Board acts to oversee and referee the process of collective bargaining, leaving the results of the contest to the bargaining strength of the parties. . . . The Board's remedial powers under § 10 of the Act are broad, but they are limited to carrying out the policies of the Act itself. One of these fundamental policies is freedom of contract. While the parties' freedom of contract is not absolute under the Act, allowing the Board to compel agreement

when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract." *Id.,* at 107–108.

The parties cannot agree to terms that violate the law, but the remedy that is generally applied is post-execution invalidation and assessment of damages, rather than "official compulsion over the actual terms of the contract." [8] Hence, the Court's recognition of such a power reposing in the Commission is fundamentally at odds with national labor policy.

The Court insists that concern over "the possible impact of the Commission's decision on the collective-bargaining process [is] exaggerated and [does] not justify the major surgery performed on § 15 by the decision below." *Ante,* at 57. It is suggested that few labor agreements will have to be filed, because § 15 does not apply to contracts between a union and a single employer, and the Commission has forsworn jurisdiction over agreements falling within the uncertain contours of a "labor exemption" to be developed in the course of agency adjudications. *Ante,* at 57–58.

It is by no means clear to me that the Court's optimism is justified. Labor unions and management groups, following the course of caution, are likely to respond to today's decision by filing all labor agreements with the Commission. Respondents can take little comfort in the assertion that "routine," Brief for Petitioners 28, or "ordinary collective-bargaining

---

[8] For example, although § 8 (e) of the National Labor Relations Act, 29 U. S. C. § 158 (e) (1970 ed., Supp. V), prohibits entering into a "hot cargo" agreement, there is no requirement that the parties submit a proposed agreement to the Board for prior clearance. The Board's remedial authority is limited to the obtaining of a preliminary injunction under § 10 (*l*), 29 U. S. C. § 160 (*l*), and the ultimate issuance of a cease-and-desist order, requiring enforcement by a court of appeals.

agreements" will not "be subject to the requirements of § 15," *ante*, at 57.[9]  Few agreements negotiated between a union and a multiemployer bargaining association for the purpose of governing working relations at a major port are likely to be so "routine" that the parties safely may assume that they enjoy an exemption from § 15.  A degree of uncertainty and delay, then, would seem an inevitable byproduct of § 15 jurisdiction over maritime labor relations.

Similarly, the possibility that the Commission may find that a particular agreement qualifies for a "labor exemption" does not offer a realistic palliative for the probable impact of the Court's decision on free collective bargaining.  The Court suggests that the Commission may apply its special understanding of the requirements of anticompetitive policy,[10] but there is no well-developed corpus of maritime labor-antitrust decisions to guide the formulation of labor agreements in the industry.  The Commission has identified four nonexclusive, nondeterminative criteria to inform its "labor exemption"

---

[9] The Court's discussion on this point is somewhat unclear.  The argument appears to be, as observed in the text, that "ordinary collective-bargaining agreements" would not "be subject to the requirements of § 15," *ante*, at 57, apparently because their conformity with antitrust and Shipping Act policies may be presumed.  If the Court is simply saying, however, that such agreements are likely to be "routinely approved even if filed," *ibid.*, this is no answer to respondents' contention that compliance with § 15 prevents the prompt implementation of compromise agreements worked out in eleventh-hour bargaining sessions that often is necessary to the preservation of labor peace.

[10] "We should add that since the Shipping Act contains its own standards for exempting and for approving· and disapproving agreements between carriers, and because the ultimate issue in cases such as this is the accommodation of the Shipping Act and the labor laws, rather than the labor laws and the antitrust laws, it will not necessarily be a misapplication of the statutes if the exemption for collective-bargaining contracts from Shipping Act requirements is not always exactly congruent with the so-called labor exemption from the antitrust laws as understood by the courts." *Ante*, at 63.

rulings.[11] The brief history of the Commission's entry into the maritime labor field, however, see n. 1, *supra,* offers little basis for hope that its assertion of § 15 jurisdiction will not impair the collective-bargaining process. In the final analysis, the substantial penalties provided by the Act[12] for "guessing wrong" make it unlikely that the disruption and uncertainty inherent in this prior-restraint scheme will be allayed significantly by the rulings of a federal agency inexpert in labor and labor-antitrust matters.[13]

## III

I cannot agree that either the statutory language or the

---

[11] "These criteria are by no means meant to be exclusive nor are they determinative in each and every case. Just as in the accommodation of the labor laws and the antitrust laws the courts have resolved each case on an ad hoc basis, so too will we. Each of the following criteria deserves consideration, but it is obvious that each element is not in and of itself controlling. They are rather guidelines or 'rules of thumb' for each factual situation." *United Stevedoring Corp.* v. *Boston Shipping Assn.,* 16 F. M. C., at 12.

Although the Commission has promised to undertake a rulemaking proceeding to promulgate more precise standards for its "labor exemption," *id.,* at 15, no regulations have been forthcoming.

[12] Noncompliance with § 15 exposes the offending party to a civil penalty of not more than $1,000 for each day of violation. If the agreement, or its implementation, is ultimately held to violate § 16 as well, the party also may be guilty of a misdemeanor punishable by a fine of not more than $5,000 for each offense.

[13] The power of the Commission to grant temporary approvals under § 15, *e. g., New York Shipping Assn.* v. *FMC,* 495 F. 2d, at 1218, has not been passed on by a federal court, see *Marine Cooks & Stewards* v. *FMC,* No. 75-2013 (CADC Feb. 4, 1977) (dismissing appeal). In any event, this dispensation is a matter of administrative grace. The problems of uncertainty and delays are not likely to disappear because there is a chance that the Commission may be persuaded to issue a temporary approval. And, as the Court of Appeals recognized, even if such a power and its frequent exercise are assumed, interim approval "does not remove the possibility of later unilateral modification by the Commission . . . ." 177 U. S. App. D. C. 248, 260, 543 F. 2d 395, 407 (1976).

legislative history [14] of § 15 requires that it be made applicable to collective-bargaining agreements. Neither contains any reference to labor agreements. Although § 15 reaches a broad spectrum of arrangements, its terms apply only to agreements among "common carriers by water" or "other persons subject to this chapter." [15] Unions are not persons subject to the Act. One would have thought that if Congress had wished to include collective-bargaining agreements within the scope of § 15, it would have done so specifically or, at least,

---

[14] Petitioners concede that "[t]he legislative history of the Shipping Act is unilluminating concerning Congress' specific intent where a labor union is a signatory to an agreement otherwise subject to the Act. . . ." Brief for Petitioners 24 n. 25.

Legislative developments after the passage of the Shipping Act highlight the improbability of § 15 jurisdiction over labor agreements. In 1938, Congress created a Maritime Labor Board (MLB) for the purpose of encouraging collective bargaining and assisting in the peaceful settlement of disputes through mediation. A provision of the 1938 measure, § 1005, 52 Stat. 967, required every maritime employer to file with the MLB a copy of every contract with any group of its employees covering wages, hours, and working conditions. A 1941 House Committee Report on a bill providing for a two-year extension of the 1938 machinery noted:

"This is the only Government agency with which copies of all labor agreements are required to be filed and these have been studied by the Board with a view to promoting stable labor relations in the maritime industry.

"One of the most unique provisions . . . requires the filing with the Board of all maritime labor agreements. The 4,303 collective agreements filed with the Maritime Labor Board represent the most complete file of collective agreements in the maritime industry, *as employers are not required to file agreements, covering their maritime employees, with any other Federal agency.*" H. R. Rep. No. 354, 77th Cong., 1st Sess., 5 (1941) (emphasis supplied).

The MLB ultimately was discontinued.

[15] The term "other person subject to this chapter" "means any person not included in the term 'common carrier by water,' carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water." 46 U. S. C. § 801.

it would have provided for jurisdiction over the indispensable party to such an agreement—the labor union.[16]

The terms of § 15 must be construed in light of the considerations that led to federal regulation of the maritime industry [17] and encouraged Congress to empower the Commission to immunize restrictive agreements among shippers and others subject to the Act from all antitrust scrutiny.[18] The Court's ruling abstracts this power of approval from the particular context that prompted Congress to accord certain agreements an immunity premised on Shipping Act policies which did not necessarily reflect antitrust principles.[19] In

---

[16] By contrast, § 16 bars certain discriminatory acts engaged in by "any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person . . . ." The term "person" "includes corporations, partnerships, and associations, existing under or authorized by the laws of the United States, or any State, Territory, District or possession thereof, or of any foreign country." 46 U. S. C. § 801.

[17] The guiding force in the development of the Shipping Act was the House Committee that issued the "Alexander Report." House Committee on Merchant Marine and Fisheries, Report on Steamship Agreements and Affiliations, H. R. Doc. No. 805, 63d Cong., 2d Sess. (1914). See *Federal Maritime Board* v. *Isbrandtsen Co.*, 356 U. S. 481, 490 (1958). The Alexander Committee principally addressed the methods for control of competition employed by steamship lines and water carriers that had cartelized much of the industry. Alexander Report 409–412, 415, 421–422. To ensure Government surveillance of these practices, the Committee recommended that all carriers engaged in the foreign and domestic trade of the United States file with the Government all agreements entered into with any other carrier, shipper, railroad, or other transportation agencies. *Id.*, at 419–420, 422–423.

[18] Concluding that outright prohibition of steamship agreements and conference arrangements would result only in rate wars and anticompetitive mergers, the Alexander Committee "chose to permit continuation of the conference system, but to curb its abuses by requiring government approval of conference agreements." *FMC* v. *Seatrain Lines, Inc.*, 411 U. S. 726, 738 (1973).

[19] At least until 1961, it was an open question whether the Commission could take antitrust policies into account when ruling on proposed agreements. *Id.*, at 739. Apparently, the approval of an agreement, premised

*Volkswagenwerk,* the Court recognized § 15 jurisdiction over an agreement among members of respondent Association, to which a grant of immunity, after Commission study and approval, would have been understandable. That agreement presented only Shipping Act considerations. As the Government pointed out in that case, the assessment formula was "not a part of [the labor] contract, involve[d] no question of labor relations, and [was] not subject to the jurisdiction of the Labor Board." See n. 4, *supra.* I find it difficult to believe, however, that Congress in 1916 intended to empower the Commission to approve, and thereby immunize from the reach of the antitrust laws, the varied terms of collective-bargaining agreements.

The Commission in this case found that the agreement fell within the third category of § 15—which concerns agreements "controlling, regulating, preventing, or destroying competition." *Pacific Maritime Assn.—Cooperative Working Arrangements,* 18 F. M. C. 196 (1975). Undoubtedly, some maritime labor agreements will pose antitrust problems. But we must recognize, as we did in *FMC* v. *Seatrain Lines, Inc.,* that a broad "reading of the Commission's jurisdiction would increase the number of cases subject to potential antitrust immunity," and "conflict with our frequently expressed view that exemptions from antitrust laws are strictly construed, see, *e. g., United States* v. *McKesson & Robbins, Inc.,* 351 U. S. 305, 316 (1956) . . . ." 411 U. S., at 733, and n. 8.

Plenary review by the Commission of all maritime labor agreements that now will have to be filed in their entirety may be avoided only by retroactive, piecemeal grants of a "labor exemption." [20] The better course would be to recognize that

---

on a consideration of Shipping Act policies alone, was sufficient to confer an immunity from the antitrust laws.

[20] The Commission's assertion of power to accord a "labor exemption" after filing to particular collective-bargaining agreements, or portions thereof, does not fit neatly within the authorization of § 35 of the Act,

bona fide collective-bargaining agreements, as a class, do not come within § 15.

## IV

An exemption from the filing and prior-clearance regime of § 15 would not shield collective-bargaining agreements from all scrutiny under the Shipping Act. It would remain open to the Commission to determine that a particular agreement was not the product of arm's-length negotiations, but rather was an effort to circumvent § 15 by clothing a restrictive arrangement otherwise subject to the filing requirement with the trappings of a labor accord. Moreover, even a bona fide collective-bargaining agreement, or at least action taken in its implementation, may be reviewed under §§ 16 and 17. Petitioners have not demonstrated that vindication of Shipping Act policies requires the application of § 15, in the first instance, to genuine collective-bargaining agreements. Indeed, the Commission's recognition of a "labor exemption" and its unreviewed assertion of power to accord "interim approval" to labor agreements, see n. 13, *supra,* suggest that the proposed remedy for an occasional evasion of the Shipping Act through the device of the collective-bargaining agreement may be likened to using "a sledge hammer to fix a watch." *Volkswagenwerk* v. *FMC,* 390 U. S., at 296 (Douglas, J., dissenting in part).[21]

I respectfully dissent.

---

46 U. S. C. § 833a. That provision contemplates action "for the future," after opportunity for a hearing, exempting "any class of agreements between persons subject to this chapter or any specified activity of such persons . . . ."

[21] Because of my conclusion that § 15, properly read, does not apply to bona fide collective-bargaining agreements, I do not reach the question of whether the Commission interpreted correctly *Mine Workers* v. *Pennington,* 381 U. S. 657 (1965), to deny a "labor exemption" from the Shipping Act to the agreement in question.