FALSTAFF BREWING CORPORATION,
Plaintiff,

v.

LOCAL NO. 153, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,
Defendant.

LOCAL UNION NO. 153, INTERNATION-
AL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN
AND HELPERS OF AMERICA, an un-
incorporated labor union, Plaintiff,

v.

FALSTAFF BREWING CORPORATION,
a corporation of the State of Delaware
and authorized to do business in the
State of New Jersey, Defendant.

Civ. A. Nos. 76–1383, 78–1483.

United States District Court,
D. New Jersey.

Nov. 3, 1978.

Pachman, Aron & Till by Peter W. Till, Jersey City, N. J., and Blank, Rome, Klaus & Comisky by Robert D. Kaplan and Michael A. Davis, Philadelphia, Pa., for Falstaff Brewing Corp.

Schneider, Cohen & Solomon by Edward A. Cohen, Jersey City, N. J., for Local No. 153, etc.

## OPINION

MEANOR, District Judge.

Local No. 153, International Brotherhood of Teamsters (hereinafter "Union") has moved to enforce an arbitration award against Falstaff Brewing Corporation (hereinafter "Falstaff"). Falstaff has filed a cross-motion seeking to reopen Civil No. 76–1383 and consolidate that matter with Civil No. 78–1483 (the Union's enforcement action). Falstaff also seeks to vacate the arbitration award. At a hearing on these motions held October 10, 1978, this court granted Falstaff's motion to reopen Civil No. 76–1383 and to consolidate it with Civil No. 78–1483. At that hearing, Falstaff was also granted leave to file an amended complaint in Civil No. 76–1383. After oral argument, I indicated to counsel that I would reserve decision on whether to enforce or vacate the arbitration award. I also stated that my then present intention was to enforce the award and announced that a formal opinion would be filed on November 3, 1978.

### I

In April 1972, Falstaff purchased the right to brew beer under the Ballantine label. As part of this purchase, Falstaff took over Ballantine's retail customer lists and delivery routes, including 15,000 to 17,-000 retail customer accounts. As a result of the purchase, the old Ballantine brewery in Newark, New Jersey was closed. After some deliveries from the warehouse in Newark, Falstaff established a retail distribution depot in North Bergen, New Jersey.

When the North Bergen Depot opened in May 1972, some 240 members of either Local 153, International Brotherhood of Teamsters or Local 843, International Brotherhood of Teamsters were employed as warehousemen, route drivers or trailer drivers at the Depot. In November 1972, following a Teamster decision to award all of the work of the Depot to Local 153, a Collective Bargaining Agreement (hereinafter "CBA") was executed and made effective from June 1, 1973 and to terminate May 31, 1976.

During the 28-month period from June 1973 until October 1975, the Depot employed approximately 140 Union members and serviced the North Jersey and Metropolitan New York, Staten Island and Western Long Island area. The work of the Depot involved deliveries from the North Bergen facility to the 15,000–17,000 retail customers which Falstaff acquired from Ballantine, and who were located in the above defined area. The deliveries were made with 33 retail delivery trucks in New York and 16 in New Jersey. One truck was used for each of Falstaff's 49 routes. Additionally, the work consisted of the warehousing for distribution to these customers of the Ballantine labeled product. This was the same work performed by the bargaining unit employees since the beginning of the Depot in 1972, and was similarly performed by these identical employees as prior employees of Ballantine at the distribution center located at the former Ballantine brewery in Newark.

In 1974 and 1975, Falstaff faced a critical financial crisis. This crisis motivated a decision to curtail the operations of the North Bergen Depot starting on October 3, 1975— eight months prior to the termination date of the CBA. A meeting of Falstaff and Union representatives was called and the Union was advised of the curtailment. Within several days after the layoffs at the

Depot began, Falstaff made arrangements with two independent distributors, Fatato in New York and Piccirillo in New Jersey, to distribute the company products in their respective states encompassing the territorial jurisdiction of the North Bergen Depot as set forth in the CBA. These distributors acquired the trucks from the Depot emblazoned with the Ballantine logo, hired some of the laid off route drivers and gained access to the Depot's customer lists. Additionally, the distributors were granted credit considerations by Falstaff toward the purchase of beer from Falstaff's Cranston, Rhode Island brewery.

The Union filed the following grievance: A dispute has arisen between the parties concerning the Company [Falstaff] contracting out of its delivery operations in violation of the various provisions of the Collective Bargaining Agreement.

On October 17, 1975, arbitration was commenced. The initial hearing was held before Arbitrator Paul W. Hardy on February 27, 1976 under the Rules and Regulations for Arbitration of the New Jersey State Board of Mediation. At this hearing the parties entered into a submission agreement:

We the undersigned hereby agree to submit the following controversy to Arbitration: (No. persons involved 140)

Has the Company violated the applicable provisions of the collective bargaining agreement set forth on page 30 of the collective bargaining agreement? If so, what shall be the remedy?

\* \* \* \* \* \*

We hereby agree to submit such controversy for decision to PAUL W. HARDY.

We further agree that we will faithfully abide by and perform any award made pursuant to this agreement and that such award shall be binding and conclusive upon us.

This submission agreement was signed by counsel for the parties.

The parties thereafter agreed to bifurcate the hearing and to first present evidence and argument relating to the issue of liability on February 27, 1976. On April 21, 1976, the arbitrator issued an "Opinion and Award" confined to the question of whether Falstaff had violated the pertinent provisions of the CBA as set forth in Article XVI at page 30. These provisions state:

ANTI–DISCRIMINATION.

\* \* \* \* \* \*

Except as otherwise may be agreed upon between the Depot and the Union, the bargaining unit work shall continue to be performed by the employees in the bargaining unit except that the washing of vehicles may be sub-contracted to an independent agency.

\* \* \* \* \* \*

The delivery of products coming within the Falstaff local retail delivery operation in North Bergen, New Jersey, shall be the jurisdiction of Local 153.

It shall be the Depot's policy to use available Depot equipment in preference to available outside equipment unless otherwise agreed upon by the Depot and the Union.

The arbitrator ruled for the Union, finding that Falstaff had failed to abide by the provisions of the CBA.

On July 16, 1976, Falstaff filed Civil No. 76–1383 in this court to vacate and set aside the arbitrator's "Opinion and Award". On September 2, 1976, this court stayed further proceedings in the action pending final conclusion of the continuing arbitration hearings. The case was "administratively terminated" on September 17, 1976, because of the ongoing arbitration. The termination Order was entered without prejudice to reopen at a later date.

The arbitration hearings resumed in August 1976, at which time various issues relating to remedy were heard. On January 20, 1977, the arbitrator issued an "Interim Award" which held, *inter alia*, that the CBA was still in effect and would remain so until May 31, 1977. Because of the finding that the CBA was extended for a year beyond the termination date set in Article XXII of the CBA, the arbitrator ordered

that "the Company should cease and desist continuing to use distributors to distribute its Ballantine Falstaff labeled products in the New Jersey-New York metropolitan area previously serviced from its North Bergen depot." Interim Award, ¶ 1. Falstaff never complied with the cease and desist order.

The "Interim Award" further held that all employees laid off in October 1975 were entitled to monetary damages because they lost their employment due to Falstaff's violation of the CBA by converting to the use of independent distributors. Interim Award, ¶ 2. The arbitrator determined the method of calculating damages, Interim Award, ¶ 3, and made findings concerning health and welfare insurance coverage as well as pension credits due under the CBA. Interim Award, ¶ 4. Finally, the arbitrator held that the "[i]nterim Award shall guide the parties in the computation of damages . . . ." Interim Award, ¶ 5.

After the filing of the "Interim Award", the arbitrator conducted hearings on the damages aspect of the case on various days from December 2, 1977 to April 18, 1978. On June 23, 1978, the arbitrator issued his "Final Opinion and Award" which reiterated the finding of the April 21, 1976 "Opinion and Award" that Falstaff violated the CBA, reaffirmed the contract extension finding of the "Interim Award", and fixed damages for back pay losses and loss of medical-insurance coverage suffered by the employees through May 31, 1977 in the amount of $1,560,189.31. The arbitrator further directed that Falstaff pay interest on that amount retroactive to June 1, 1977, at the rate of 7½% per year (.625% per month) and until payment of the damages is actually made to counsel for the Union. "Final Opinion and Award" at 15.

The contractual provisions authorizing and limiting arbitration are contained in Article XI of the CBA:

A grievance within the meaning of the grievance procedure shall be defined as any difference between the Depot and the employees covered by this Agreement or between the Depot and the Union as to: (a) any matter relating to wages, hours of work or working conditions covered by this Agreement, and (b) any matter involving the interpretation, application or claimed violation of this Agreement.

\* \* \* \* \* \*

STEP 4

\* \* \* \* \* \*

The decision of the arbitrator which shall not be in violation of any applicable law or regulation shall be final and conclusive on the Depot, the Union, the Grievant and all employees. The arbitrator shall have no power to add to or subtract from or modify any of the terms of this Agreement or any Agreement made supplemental thereto.

Falstaff submits that rulings of the arbitrator in the "Opinion and Award", the "Interim Award" and the "Final Opinion and Award" are either contrary to law or in excess of his authority under the CBA, the submission agreement, or both. As a result, Falstaff urges this court to vacate the arbitration award. At issue are damages of $1,560,189.31 to be paid to the Union plus interest at 7½% per year until payment is actually made. To date, there has been no payment. The Union contends that the awards are within the law as well as within the arbitrator's authority, and should be enforced.

Falstaff presents the following issues for determination by this court:

A. Does the Arbitrator's award fail to draw its essence from the collective bargaining agreement in that it directly obstructs the Company's Cranston, Rhode Island, operations which are not covered by that agreement?

B. Does the Arbitrator's interpretation and application of the collective bargaining agreement violate federal antitrust and labor law in that it prohibits the Company from doing business with independent distributors at its Cranston, Rhode Island, facility?

C. Did the Arbitrator exceed his authority by ruling that the Company violated the collective bargaining agreement by permitting independent distributors to purchase beer at its Cranston, Rhode Island, facility?

D. Does the Court rather than the Arbitrator have jurisdiction to determine whether the Union terminated the collective bargaining agreement as of May 31, 1976?

E. Did the collective bargaining agreement terminate on May 31, 1976, in accordance with its own terms and based on the actions of the parties?

F. Assuming *arguendo* that the Arbitrator had jurisdiction to decide the contract extension issue, did he act arbitrarily and unreasonably in ruling that the agreement continued an additional year beyond its stated term?

G. Did the Arbitrator exceed his authority by failing to measure back pay by the amount of work actually performed by the distributors?

H. Did the Arbitrator err in imposing interest?

After consideration of and reflection upon the arguments of counsel and the voluminous documents and memoranda submitted in support thereof, it is the decision of this court that the "Final Opinion and Award" of the arbitrator shall be enforced in its entirety.

## II

Before reaching any of the issues framed by Falstaff, this court must examine the threshold question of its own scope of review of arbitration awards in light of the law and public policy behind arbitration proceedings.

In *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), the third case decided in the landmark "Steelworkers Trilogy", the Supreme Court outlined the role of the judiciary in reviewing an arbitrator's interpretation of a collective bargaining agreement as follows:

[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his. *Id.* at 599, 80 S.Ct. at 1362.

\* \* \* \* \* \*

Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. *Id.* at 597, 80 S.Ct. at 1361.

*See generally*, St. Antoine, *Judicial Review of Labor Arbitration Awards: A Second Look at "Enterprise Wheel" and Its Progeny*, 75 Mich.L.Rev. 1137 (1977).

*Enterprise* enunciated a basic philosophy that was to apply to all other labor arbitration cases. It elevated the arbitrator to an exalted status—emphasizing that there would be no interference with his award simply because a reviewing court differed with him in its interpretation of the provisions of the contract. At the same time it held a checkrein on him—confining his zone of action to the four corners of the collective bargaining agreement. *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1126 (3d Cir. 1969).

In *Honold*, the Court of Appeals formulated the standard that this Circuit now applies in translating the "essence" test into the appropriate extent or limitation of judicial review of the arbitrator's interpretation. The *Honold* panel held:

that a labor arbitrator's award does "draw its essence from the collective bargaining agreement" if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where

there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.

*Id.* at 1128.

The *Honold* court stressed the Circuit's awareness of and concern for the strong public policy of encouraging the peaceful settlement of industrial disputes by means of the arbitration device. That court concluded that the Supreme Court's philosophy of restricted review at the very least means that the interpretation of labor arbitrators must not be disturbed so long as they are not in manifest disregard of the law, and that "whether the arbitrators misconstrued a contract" does not open the award to judicial review. *Id.* The Court of Appeals recently reaffirmed the *Honold* standard in *International Brotherhood of Teamsters, Etc. v. Western Pennsylvania Motor Carriers Assoc.*, 574 F.2d 783 (3d Cir. 1978).

■ Here, Falstaff and the Union entered into the CBA in June 1973. The submission agreement signed by the attorneys for the parties stated:

We further agree that we will faithfully abide by and perform any award made pursuant to this agreement and that such award shall be binding and conclusive upon us.

Thus, there can be no doubt that Falstaff agreed to submit the controversy to the arbitrator and further agreed to be bound by his findings and remedies. Where parties to a collective bargaining agreement have provided that arbitration shall be the final and binding method for settling grievances, the arbitration award is generally nonreviewable by a court. This serves the legislative policy of allowing the parties to a collective bargaining agreement to determine in advance the desired method of grievance resolution. *Westinghouse Elevators of Puerto Rico, Inc. v. S.I.U. de Puerto Rico*, 583 F.2d 1184, 1185–1186 (1st Cir. 1978).

■ The essence of the arbitration process is that an arbitral award shall put the dispute to rest. Finality is the ideal that Congress has endorsed:

*Final* adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement.

Labor-Management Relations Act § 203(d), 29 U.S.C. § 173(d) (1970) (emphasis added). Accordingly, when the losing party in arbitration asks a court not to give effect to an award, it is asking that the conclusiveness which is at the heart of the process be withheld. The core considerations seem clear. First, the parties have contracted for a final and binding award; the party who resists adherence to it is therefore seeking to be relieved of his bargain. Second, whether judicial intercession results in enforcement or vacation of the award, expediency in the resolution of the dispute is lost. Comment, *Judicial Deference to Arbitral Determinations: Continuing Problems of Power and Finality*, 23 U.C.L.A.L.Rev. 936, 949 (1976). The "binding and conclusive" provision of the submission agreement between Falstaff and the Union could not be clearer in evidencing their intent to put this dispute to rest through the arbitral process.

In its complaint filed in Civil No. 76–1383, Falstaff invokes this court's jurisdiction under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, as well as other statutes (including the Federal Arbitration Act, The Sherman Act and the diversity statutes). The Supreme Court has defined the scope of judicial inquiry under § 301 of the LMRA as follows:

[T]o be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made.

*United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Citing

the above statement from *Warrior & Gulf*, this court through Judge Fisher in *Local 701 v. Needham's Motor Service, Inc.*, 82 LRRM 2412 (D.N.J.1972), held that a submission agreement submitting a dispute to arbitration for a final and binding decision constituted a waiver of the right of the parties to have the dispute settled by any tribunal other than the arbitrator upon whom jurisdiction was granted through the submission agreement. An agreement that an arbitration award shall itself be final and binding upon the parties generally precludes judicial review. *Monte v. Southern Delaware County Authority*, 335 F.2d 855, 857 (3d Cir. 1964).

■ An eminently practical approach for any respondent in arbitration who believes the arbitrator lacks jurisdiction, is to preserve explicitly his challenge to jurisdiction and to declare that his challenge will be presented to a court if there is an adverse decision on the merits. St. Antoine, *Judicial Review of Labor Arbitration Awards, supra*, 75 Mich.L.Rev. at 1151. Courts respect such reservations and do not accord the resulting awards the usual presumption of legitimacy. *Local 719, American Bakery Workers v. National Biscuit Co.*, 378 F.2d 918 (3d Cir. 1967). The record before this court reveals no such challenge to the arbitrator's jurisdiction coupled with any statement preserving such a challenge for review by a court.

■ Falstaff contends that the arbitrator has exceeded his authority under the contract and that his award fails to draw its essence from the CBA. In *NF&M Corporation v. United Steelworkers of America*, the Court of Appeals for the Third Circuit noted:

> An arbitrator is not required to list his reasons for the award, nor should an ambiguity in his opinion be seized upon to support an inference that he exceeded his authority. *Enterprise, supra.* Further, a court is precluded from overturning an award for errors in assessing the credibility of witnesses, in the weight accorded their testimony, or in the determination of factual issues.

524 F.2d 756, 759 (3d Cir. 1975). Accordingly, in order for this court to determine whether the arbitrator's award draws its essence from the CBA, it may look to the Agreement itself and the arbitrator's award, but it may not give *de novo* review to the merits of the arbitrator's construction of the CBA. To accept a view that the courts could, under the standard arbitration clause, review the merits of every construction of the contract would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final. *Enterprise Wheel and Car Corp., supra*, 363 U.S. at 598–599, 80 S.Ct. 1358. Constrained by the narrow scope of review permitted under the *Honold* standard, this court may now proceed to examine the issues as presented by Falstaff.

### III

In issues A, B and C (pages 854–855 of this opinion), Falstaff raises for consideration the effect of the CBA on the company brewery at Cranston, Rhode Island. Falstaff urges that the arbitrator's award directly obstructs the Cranston operations which are not covered by the CBA. Falstaff additionally contends that the arbitrator's interpretation and application of the CBA violates Section 1 of the Sherman Act, 15 U.S.C. § 1 (Supp.1978), and Section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e) (1973), in that it prohibits Falstaff from selling beer for resale to independent distributors at the Cranston facility.

It is significant that never before, throughout the liability phase of the arbitration proceedings, had Falstaff ever raised the issue of the CBA's effect on the Cranston brewery. In *Mogge v. District 8, International Ass'n of Machinists*, 454 F.2d 510 (7th Cir. 1971), a panel of the Court of Appeals for the Seventh Circuit (which included the now Mr. Justice Stevens) held that where a party to an arbitration proceeding fails to bring certain matters to the arbitrator's attention, that party when seeking to vacate the award may not supplement the record before the court. That

court noted in language most applicable in the case at bar:

> The national labor policy of encouraging private arbitration of labor disputes, because of its potential for expeditious disposition of these matters without resort to the courts, has been thwarted in this protracted case. To allow [defendant], after arbitration, to have the court supplement the record with information that was available at the time of arbitration would further undermine the very purpose of private arbitration. We have concluded that these matters were never properly preserved for appeal.

*Id.* at 513.

Falstaff contends that the CBA, as interpreted by the arbitrator, forecloses the independent distributors from the market and constitutes an unlawful concerted boycott. Additionally, Falstaff contends that the re-sale by independent distributors of beer produced at the Cranston plant is not work "fairly claimable" by the bargaining unit, and that Section 8(e) of the National Labor Relations Act makes illegal the Falstaff-Union contractual provision, interpreted by the arbitrator to require Falstaff to refuse to deal with independent distributors. In response, the Union contends that the provisions on page 30 of the CBA which were the subject of the arbitration proceedings, were primary work preservation provisions, and that such a provision in a collective bargaining agreement has never been held violative of the Sherman Act.

Following both the arbitrator's "Opinion and Award" of April 21, 1976, and the "Interim Award" of January 20, 1977, Falstaff filed charges with the National Labor Relations Board advancing the contention that the arbitrator's interpretation of these provisions made them lose their status as primary work preservation provisions. Additionally, Falstaff urged that the arbitrator's ruling that all employees were entitled to damages from the conversion to independent distributors was "evidence" that they were not still primary work preservation provisions. Following investigation by the Regional Director of the N.L.R.B., each charge was dismissed.

In *International Brotherhood of Teamsters, Local No. 153 (Falstaff Brewing Corp.)*, NLRB Case No. 22–CE–36, the dismissal letter of November 11, 1976 stated:

> In this regard, it was noted that the contractual provisions, set out on page 30 of the collective bargaining agreement, are lawful on their face and that nothing in Arbitrator Hardy's decision warrants a different conclusion. It was also noted that Local 153 had both during the arbitration hearing of August 23, 1976 and in subsequent correspondence to the arbitrator specifically disclaimed any intent of work acquisition and limited its position in the pending damage portion of the arbitration matter to that of merely preserving the unit work of the North Bergen depot employees. As the Board has held that Section 8(e) of the Act does not bar contractual provisions which merely seek to preserve for employees traditional bargaining unit work the agreement was deemed to be lawful in this regard.

(Citations omitted.) On January 24, 1977, an appeal taken by Falstaff from this decision was denied by the Office of Appeals for the reasons stated by the Regional Director.

Falstaff filed the same charge after the arbitrator's January 20, 1977 "Interim Award" in which he found that all depot employees terminated after October 3, 1975 were entitled to back pay and that the measure of damages was based upon their prior average earnings. The N.L.R.B. Regional Director's dismissal letter in this case, NLRB Case No. 22–CE–37, under the same caption, issued March 8, 1977, stated:

> In Case No. 22–CE–36 involving the instant parties, I determined that the same contract as interpreted by Arbitrator Hardy's decision of April 21, 1976 determining the merits of the parties' dispute was not violative of Section 8(e) of the Act but rather was merely a construction limited to preserving the unit work of the North Bergen depot employees. At that time I noted that Local 153 had specifically disclaimed any intent of

work acquisition and limited its position before Arbitrator Hardy to that of seeking merely to preserve unit work. Subsequent to his decision of January 20, 1977, Local 153 has reaffirmed their positions. In light of this and noting that Local 153 has not taken any action inconsistent with that position, I have determined that the contract as interpreted by the January 20, 1977 decision is a lawful unit work preservation agreement.

(Citations omitted.)

You also contended that the arbitrator, in finding that all 140 employees, employed at the time Falstaff used independent distributors exclusively, are entitled to back pay, thereby disclosed that Local 153 is seeking more than the preservation of unit work. In this connection, you have noted as relevant that the present volume of work done by the independent distributors is only approximately one-half of the amount which had been done at the North Bergen facility, when it was operative. I find no merit to this contention as the arbitrator's award is clearly limited to damages incurred by Falstaff's *converting* to the use of independent distributors and as Local 153 has clearly limited the award to unit work lost.

(Emphasis in original.)

On April 12, 1977, an appeal taken from this second decision by Falstaff was denied by the Office of Appeals for the reasons stated by the Regional Director. This concluded the N.L.R.B. proceedings in this case.

■ It is obvious that the N.L.R.B. has concluded that the page 30 provisions are lawful unit work preserving agreements. Such a work preservation provision of a collective bargaining agreement, protected by Section 8(e) as a proper negotiated condition of employment, cannot be a violation of the Sherman Act. In *Federal Maritime Commission v. Pacific Maritime Assn.*, 435 U.S. 40, 57, 98 S.Ct. 927, 937, 55 L.Ed.2d 96 (1978), the Supreme Court set forth the general status of the interaction of the Sherman Act and the labor exemption to that Act:

[Ordinary collective bargaining agreements establishing wages, hours, and working conditions in a bargaining unit] are the product of bargaining compelled by the labor laws, which themselves were enacted pursuant to the power of Congress to regulate commerce in the public interest. They are also the kind of contracts that the courts, because of the collective-bargaining regime established by the labor laws, in the main have declared to be beyond the reach of the antitrust laws, the statutes specifically designed to protect the commerce of the United States from anticompetitive restraints.

In holding that legitimate working conditions set forth in collective bargaining agreements do not violate the Sherman Act, the Supreme Court has repeatedly stated that "[C]ongressionally permitted union activities may restrain trade in and of themselves," but remain lawful. *Ramsey v. United Mine Workers*, 401 U.S. 302, 313, 91 S.Ct. 658, 665, 28 L.Ed.2d 64 (1971); *Allen Bradley Co. v. Local Union No. 3, IBEW*, 325 U.S. 797, 811, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945).

In the instant case, we are dealing with the normal collective bargaining relationship, a CBA between one union and one employer covering actual employees working out of a single job site (the North Bergen Depot), and a primary job preservation provision which the N.L.R.B. has already found to be lawful both as written and as applied by the arbitrator here. *Cf. Connell Construction Co. v. Plumbers Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975).

■ Falstaff's attempt to vacate the arbitration award based upon its view that the arbitrator's interpretation of the page 30 provisions constitutes a violation of Section 1 of the Sherman Act and Section 8(e) of the National Labor Relations Act is without merit. The argument advanced by Falstaff that the arbitrator's "Interim Award" finding that the company "should cease and desist continuing to use distributors to distribute its Ballantine Falstaff labeled prod-

ucts in the New Jersey-New York metropolitan area previously serviced from its North Bergen depot", exceeded his authority under the CBA is, at best, transparent. Examination of the language of the "Interim Award" reveals that the "cease and desist" finding is in the context of determining that the CBA was effective until a certain date, May 31, 1977. It is obvious that the arbitrator's prohibition of independent beer distribution was limited to the effective dates of the CBA. There is simply no way to construe the language of the arbitrator as extending the prohibition beyond May 31, 1977. Thus, the prohibition was derived from the very essence of the CBA—from the page 30 work preservation provisions and from the termination provision of Article XXII. Moreover, the "cease and desist" finding was in the "Interim Award" which Falstaff ignored. There is no "cease and desist" language included in the "Final Opinion and Award". In this last award, the arbitrator directed Falstaff to pay back pay and damages, and to supply lost pension credits to employees; that is all. Falstaff's contention that the arbitrator's interpretation of the CBA interfered with the operations of the Cranston brewery may have been an issue earlier in the arbitration proceedings. However, the issue was never raised in the liability phase, Falstaff never complied and thus was not prejudiced, and the CBA has now expired rendering the issue moot.

Issues C, D and E advanced by Falstaff (page 855 of this opinion) pertain to the arbitrator's finding that the contract was extended an additional year, to May 31, 1977 by the terms of Article XXII. This termination clause states:

## TERMINATION

This Agreement shall be in full force and effect from June 1, 1973 to and including May 31, 1976, and shall automatically continue from year to year until either party serves written notice on the other party sixty (60) days prior to any annual expiration date that changes are desired herein and that the desired changes will be submitted thirty (30) days prior to the expiration. During the term of this Agreement, the employees represented by the Union and its members will continue to work without strike.

Here, Falstaff contends that the arbitrator never had jurisdiction to arbitrate the issue of contract extension, and that such an issue could only be properly before a court. On the assumption that *this court* accepts that proposition, Falstaff then argues the merits of whether the CBA expired on May 31, 1976, in accordance with its own terms, based upon the actions of the parties. Falstaff then concludes by asserting that, if the arbitrator did have jurisdiction, he decided the issue in an arbitrary and unreasonable manner.

Falstaff's assertion that the arbitrator lacked jurisdiction to arbitrate the issue is unsupportable. Although Falstaff vigorously claimed throughout the damages phase of the proceedings that the CBA expired on May 31, 1976 as a matter of law, it never raised the question of arbitrability in any of its extensive memoranda nor in the testimony before the arbitrator. The record demonstrates that the merits of the issue of contract termination or extension was, *by express stipulation* of both Falstaff and the Union, submitted to the arbitrator for decision without reservation or qualification. Additionally, the record indicates that Falstaff (along with the Union) strongly urged the arbitrator to decide the merits in his arbitration award of the issue because such a decision was vital to damage calculations that would have to be made. The transcript of the August 23, 1976 hearing before the arbitrator includes the following statement by Kenneth F. Kahn, Esq. of the Philadelphia firm Blank, Rome, Klaus & Comisky representing Falstaff:

Mr. Kahn: I think Ed [Cohen, the attorney for the Union] and I both have certain stipulations which we can present to you on matters which we need some guidance on in terms of a preliminary award on the damages so that we can, therefore, proceed and calculate what would be due. I think

the first question is whether the Collective Bargaining Agreement terminated on May 31, 1976 or whether it still continues in full force and effect. Number two would be. . .

Transcript at 56–57.

In its post-hearing memorandum, Falstaff urged the arbitrator to decide the issue and specifically refers him to the arguments on the merits submitted in Falstaff's pre-hearing memorandum. Post-hearing Memorandum at 2. Thus, the issue of whether or not the CBA had actually expired, or continued beyond May 31, 1976, was the first stipulated issue presented to the arbitrator at the hearing on the damages phase of the case. The issue of arbitrability was never posed at all. Even on the final day of hearing, April 18, 1978, when Falstaff moved to reargue to the arbitrator his prior rulings on several issues, including the CBA termination issue, there was no claim of lack of jurisdiction or want of arbitrability. Accordingly, Falstaff's argument to this court that the termination issue was not arbitrable must fail. Both parties clearly submitted the issue to the arbitrator.

 The merits of the contract extension issue do not bear more than cursory examination by this court once it has been determined that the arbitrator did, indeed, have the power and authority to decide the issue. *See* Part II of this opinion on this court's scope of review of an arbitration award involving contract interpretation. The "Final Opinion and Award" sets forth the arbitrator's findings and rationale behind construing the Termination clause to extend the CBA until May 31, 1977. Appendix at 6–7. In light of the arbitrator's analysis of the facts presented to him, this court concludes that it is logically possible to interpret Article XXII the way the arbitrator did. My subjective opinion as to the proper construction or application of the clause is of no moment here. *General Teamsters, Chauffeurs and Helpers, Local Union No. 249 v. Potter-McCune Company,* 412 F.Supp. 8, 11 (W.D.Pa.1976). Certainly,

the arbitrator had grounds upon which to base his interpretation. *Cf. H. K. Porter Co., Inc. v. United Saw, File and Steel Products Workers of America,* 333 F.2d 596, 602 (3d Cir. 1964). Whether such an interpretation is the best interpretation is not a matter for this court. *Enterprise Wheel and Car Corp., supra,* 363 U.S. at 599, 80 S.Ct. 1358.

Issues G and H presented for consideration by Falstaff (page 855 of this opinion), raise the damages and interest award for this court's scrutiny. Falstaff contends that the arbitrator exceeded his authority by failing to measure back pay by the amount of work actually performed by the independent distributors who replaced the laid off members of the bargaining unit. Falstaff also asserts that the arbitrator erred in imposing interest.

 The appropriate measure of damages was also an issue that was stipulated to at the August 23, 1976 hearing. Each side outlined its various theories of how to measure the damages both at the hearing and in subsequently submitted memoranda. (Falstaff's memo on damages runs a remarkable 133 pages). Falstaff now contends that the "arbitrator applied a faulty method to determine loss of wages and back pay." Falstaff Brief at 80. This is very simply a situation where the arbitrator did not accept any of the various damages theories put forth by Falstaff. The arbitrator found, in the "Final Opinion and Award" that:

> The proper measure of monetary damages in this type of case is based upon lost earnings, if any, and damages for loss of medical insurance coverage, if any, to all employees laid off as a result of the Company's wrongful conversion to the use of independent distributors. The hearings between December, 1977 and April, 1978 supplies the evidence necessary for the calculations. I find that all of the employees being given relief are entitled to relief for the Company's violation of the Agreement.

Final Opinion and Award at 8–9.

The argument that Falstaff advances here, that the measure of damages should

be based upon the amount of product distributed through the independent distributors, is the same argument made before the N.L.R.B. in the claim that the "Interim Award" violated Section 8(e) of the National Labor Relations Act. The Regional Director Disagreed on March 8, 1977 and dismissed Falstaff's complaint, holding:

> I find no merit to this contention as the arbitrator's award is clearly limited to damages incurred by Falstaff's *converting* to the use of independent distributors and as Local 153 has clearly limited the award to unit work lost.

(Emphasis in original.)

The facts here indicate that Falstaff had contractually agreed that the unit employees would continue, for the duration of the CBA, to distribute the beer to Falstaff's 15,000–17,000 retail customers of the Depot, and that Falstaff would use its own trucks for that purpose, as distinguished from having independent distributors do so, using their employees and trucks. This is what Falstaff promised the employees in agreeing to the work preservation provisions on page 30 of the CBA. The arbitrator found in his awards that this promise was breached when Falstaff began distributing its products to those same retail customers of the Depot through independent distributors. Falstaff had agreed with the Union and the employees that, if it was going to distribute Ballantine beer at all to those retail customers, its own employees would do so and they need not fear losing their jobs by a company conversion to independent distributors.

The arbitrator limited the damages to the unit work lost. This measure of damages was arbitrated in a series of hearings with the positions of the parties supported by lengthy pre-hearing and post-hearing memoranda. The submission agreement requested the arbitrator to determine the appropriate remedy. Both arbitration awards and N.L.R.B. decisions have used the same measure of damages as applied here. *See, e. g., Sidele Fashions, Inc.*, 36 LA 1364, 1384 (1961); *Winchester Electronics, Inc.*, 128 N.L.R.B. No. 110, 46 LRRM 2013 (1960), modified, *N.L.R.B. v. Winchester Electronics, Inc.* 295 F.2d 288 (2d Cir. 1961).

Here, the CBA is silent on matters of remedy and does not explicitly limit the arbitrator in this regard. In *Enterprise Wheel and Car Corp., supra*, 363 U.S. at 597, 80 S.Ct. at 1361, the Supreme Court addressed the issue:

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency.

This court has no doubt that the arbitrator was well within the bounds of his authority to fashion the remedy of the "Final Opinion and Award". *See, Newark Wire Cloth Co. v. United Steelworkers*, 339 F.Supp. 1207 (D.N.J.1972); *Shahmoon Ind., Inc. v. United Steelworkers of America*, 263 F.Supp. 10 (D.N.J.1966).

On the issue of interest, Falstaff contends that since the CBA is silent on the imposition of interest in a damages award, the award of interest is barred. Falstaff also urges that the imposition of interest is punitive and unwarranted. These contentions are specious; the language of the "Final Opinion and Award" is most clear and dispositive:

> The parties empowered the Arbitrator in the arbitration submission agreement to determine the proper remedy for the violation. Interest is not a penalty against the Company. Its function is to make the employees reasonably whole, and that is the proper remedy. I am also mindful of the long time that has passed since the layoff of the employees.

Final Opinion and Award at 14. Interest is within the traditional inherent powers of an arbitrator to award in order to make an employee whose rights have been violated reasonably whole.

For the foregoing reasons, the Union's motion to enforce the arbitrator's "Final Opinion and Award" is granted in its entirety. The court will enter its own Order and Final Judgment.