**UNITED STATES of America, Petitioner,**

v.

**FEDERAL MARITIME COMMISSION, Respondent,**

**Sea-Land Service, Inc., Black Sea Shipping Co., et al., Intervenors.**

**No. 79–1325.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 23, 1980.

Decided Dec. 29, 1980.

Robert J. Wiggers, Atty., Dept. of Justice, Washington, D. C., with whom Sanford M. Litvack, Asst. Atty. Gen., and Barry Grossman, Atty. Dept. of Justice, Washington, D. C., were on the brief, for petitioners.

Carol J. Neustadt, Atty. Federal Maritime Commission, Washington, D. C., with whom Brien E. Kehoe, Gen. Counsel, Federal Maritime Commission and Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Washington, D. C., was on the brief, for respondent.

Francis W. Fraser, Washington, D. C., with whom Donald J. Brunner, Washington, D. C., was on the brief for intervenor, Sea-Land Service, Inc. Paul J. McElligott, Washington, D. C., also entered an appearance for intervenor, Sea-Land Service, Inc.

Stanley O. Sher, Washington, D. C., with whom John R. Attanasio, Washington, D. C., was on the brief for intervenor, Black Sea Shipping Co., et al.

Before WRIGHT, Chief Judge and WALD, Circuit Judge and MARKEY *, Chief Judge, United States Court of Customs and Patent Appeals.

Opinion PER CURIAM.

Concurring opinion filed by Chief Judge MARKEY, U.S. Court of Customs and Patent Appeals.

PER CURIAM.

This case involves a dispute between the Antitrust Division of the Department of Justice ("the Department" or "Justice") and the Federal Maritime Commission ("FMC" or "Commission") over the merits of a revenue pooling arrangement. The Department petitions under the Hobbs Act[1] for review of an order entered by the Commission approving a pooling agreement among ten

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. 28 U.S.C. § 2342(3).

lines in the westbound container trade between Italy and the United States' north Atlantic coast. The Department argues that the Commission's order approving the agreement is not supported by substantial evidence on the record; the Commission maintains the opposite. Two intervenors [2] filed in support of the Commission's order, arguing that the Department lacks standing to challenge the FMC order and that no justiciable case or controversy exists. We conclude that the Department has standing to bring this suit and that a justiciable case or controversy exists, but that the Commission's order was supported by substantial evidence. Therefore, we affirm the Commission's order approving the revenue pooling agreement.

## I. BACKGROUND

■ Section 15 of the Shipping Act, 1916, 46 U.S.C. § 814, allows the Commission to approve various types of anticompetitive agreements, including revenue pooling arrangements, if, after "notice and hearing," the Commission concludes the agreement is neither "unjustly discriminatory or unfair" as between specified classes, "detriment[al] [to] the commerce of the United States," in violation of some other provision of the Act, nor "contrary to the public interest." Once approved, agreements are exempted from the provisions of the antitrust laws. 46 U.S.C. § 814; *FMC v. Pacific Maritime Association*, 435 U.S. 40, 45, 98 S.Ct. 927, 931, 55 L.Ed.2d 96 (1978); *Volkswagenwerk v. FMC*, 390 U.S. 261, 271, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

The instant case arose out of a revenue pooling agreement filed with the FMC for approval pursuant to section 15 of the Shipping Act, 1916, 46 U.S.C. § 814, by ten members of the West Coast of Italy, Sicilian and Adriatic Ports North Atlantic Range Conference ("WINAC"). The agreement, docketed as Agreement No. 10286, assigns a specific percentage of the revenues earned by pool members to each member carrier, and provides a penalty for any carrier whose earnings exceed its maximum pool share. J.A. 587–91 (text of agreement); 661–62 (testimony of Luigi Scaffardi, describing operation of pool agreement). Notice of the filing and an invitation to interested parties to comment was published in the *Federal Register* on March 8, 1977, 42 Fed.Reg. 10347. Justice filed a protest with the Commission, attacking the agreement as anticompetitive. J.A. 8–9.[3]

A hearing on the merits of the pool arrangement was held before a FMC Administrative Law Judge ("ALJ"). The proponents of the pool argued that it was needed to alleviate the problems of "overtonnaging"[4] and "malpractices"[5] which existed on the eastbound Italy-north Atlantic route. They produced statistics which showed that in an average month, 7,500 TEU's[6] of container space was available on the route though only 4,250 TEU's of cargo moved over it, resulting in an overtonnaging rate of 76 percent. They further showed that this rate was not likely to decline significantly despite the lack of profits because government controlled carriers, motivated by concerns apart from immediate profit-seeking, carried a majority of the cargo moved by the container carriers. J.A. 104–05.[7] The proponents also presented a wit-

**2.** Two intervenor briefs were filed, one by Sea-Land Service, Inc. ("SLS") and one by a group of ocean carriers ("intervenor carriers").

**3.** Two trade associations also filed protests, J.A. 8–9; however, these protestants did not participate in the ensuing proceedings.

**4.** "Overtonnaged" is an industry term used to denote an excess of space offered by the carriers over that necessary to carry the available cargo. J.A. 646.

**5.** "Malpractices" include a wide variety of disreputable or destructive practices. In this case,

the term is used to refer to the practice of "rebating," whereby freight forwarders secretly collect a percentage of a carrier's fee as a commission for directing the shipper's goods to it. *See* Brief for the United States at 4.

**6.** "TEU" stands for twenty-foot-equivalent units, a standard measure of container capacity.

**7.** Evidence was presented to show that three of the private firms servicing the route withdrew from it between 1976–1979, while two government lines and one private line entered it.

ness, Mr. Scaffardi, a former director of one of the lines that had left the trade and a consultant to one of those remaining, who estimated the level of rebating at 10 to 15 percent of the gross freight. No evidence of specific instances of rebating was produced; instead, an explanation of why such information was almost impossible to obtain was provided.[8] However, some evidence was produced that tended to show the departure of the private lines from the route was due to the extent of the rebating practiced. J.A. 120, 202, 656.

The Department presented one witness at the hearing, Dr. Dolan, an economist. This witness both attacked the need for the pool by pointing out deficiencies in the proponents' evidence, and claimed that market mechanisms would better solve any problems that existed. Dolan attacked the proponents' overtonnaging argument by claiming that the evidence was too incomplete to demonstrate that overtonnaging in fact existed. He argued it was possible that the excess capacity on the eastbound routes was caused by an excess of demand for westbound cargo space—that a trade imbalance existed. If that was the case, economic efficiency demanded that the westbound shippers cover any shortfalls in revenue. J.A. 321–22. Moreover, Dolan pointed out that no evidence had been presented to demonstrate that such a short-fall existed; no one had testified that the route was in fact unprofitable. As for the proponents' argument that widespread rebating justified the pool, he stressed that the proponents' witness had admitted on cross-examination that he had "no proof whatsoever" of recent malpractices. J.A. 171.

Finally, Dolan testified that competitive pricing would solve these problems, if they existed, more effectively and with fewer detrimental side effects than the pooling arrangement. He argued that government sponsored carriers would react to market forces as did privately owned ones, and would reduce their excess capacity in the absence of a pool. J.A. 313–14. Rebating would be reduced along with the excess capacity; shippers and consumers would be relieved of the burden of subsidizing excess capacity through the pool. J.A. 344–45.

The ALJ approved the pool arrangement with several modifications, "persuaded by the arguments of the proponents as to public interest and that based on inferences generally or, as here, on the Commission's special familiarity with the WINAC trade in the shipping industry [the ALJ], may and does draw inferences on these points from the incomplete evidence that was available." J.A. 523. Justice filed exceptions to this opinion; the FMC affirmed it in an order issued January 26, 1979. J.A. 543. This case is a petition for review of that order.

## II. JUSTICIABILITY

Before reaching the merits of this dispute, we must address the claims of the intervenors[9] that we lack appellate jurisdiction to review a Maritime Commission order at the behest of the Department of Justice in its role as the enforcer of the antitrust laws. The Department argues that jurisdiction exists under the Administrative Orders Review ("Hobbs") Act, 28 U.S.C. §§ 2341–2351. The intervenors counter this argument by contending that the Hobbs Act does not authorize this petition for re-

---

Brief for Respondent at 33. The entry of the private line, Sea-Train, was explained as an aberration. Sea-Train had served as a marketing agent for another line; when that arrangement was suddenly terminated, the company decided to maintain its organization, utilizing its existing vessels, under its own name. *Id.* at 34.

**8.** Scaffardi pointed out that rebating, though legal under Italian law, is subject to severe penalty under section 18(b) of the Shipping

Act, 1916, 46 U.S.C. § 817(b). Therefore, any participant would be unlikely to testify to his practices for fear of prosecution. *See* Brief of Intervenors (Except Sea-Land Service, Inc.) at 6–7. Moreover, since rebating is a form of price competition, he pointed out that it is in the carriers' business interest to keep information relating to their rebating practices away from their competitors. J.A. 629–30.

**9.** *See* note 2 *supra.*

view, and that, notwithstanding statutory authorization, the Department's petition does not present an Article III "case or controversy." Each argument will be considered separately.

### A. The Hobbs Act

█ Section 4 of the Hobbs Act provides that "[a]ny party aggrieved by ["a final order reviewable under [the Act]"] may . . . file a petition to review the order in the court of appeals wherein venue lies." *Id.* § 2344. There is no dispute but that the Commission's approval of Agreement No. 10286 was a final order reviewable under the Act, *see id.* § 2342(3), and that the Department has complied with all of the Act's procedural requirements. The only statutory question going to justiciability is whether the Act affords the Department of Justice the status of a "party aggrieved" entitled to seek review under the Act.

The Department contends that it was an "aggrieved" party in the ordinary sense of those words. It appeared in the proceeding before the Commission; the final order was adverse to the Department's interpretation of the law. The intervenors argue that no legally cognizable injury can be traced to the Commission order because neither the United States nor the Department of Justice is injured in its proprietary character by the order. Furthermore, they argue, neither can purport to represent the public interest in this litigation, as Congress by statute delegated the function of determining that interest to the Commission; by definition, then, the "public interest" requires upholding the Commission's order.

A panel of this court decided this jurisdictional question very recently in another case between the FMC and Justice, *United States v. FMC*, No. 79–1229 (D.C.Cir. December 19, 1980). In a lengthy and well-reasoned opinion, the court concluded that the Department did have standing to challenge Commission orders under the Hobbs Act. The court analyzed the question on two levels. First, it discussed the problem in terms of traditional standing doctrine; next, it considered whether any statutory language in or legislative history of the Hobbs Act would compel a different conclusion.

Beginning with the leading cases on standing to seek judicial review of agency action, *Association of Data Processing Servicing Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), the court found that a party is "aggrieved by agency action" if he establishes (1) "injury in fact, economic or otherwise," and (2) and "interest arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 152–54, 90 S.Ct. at 829–830; *id.* at 164–65, 90 S.Ct. at 836. The court found that the Commission order in that case created an injury in fact to the Department in that "Commission approval of Agreement 10140 directly interferes with the Department's responsibility to enforce the antitrust laws." *United States v. FMC, supra,* slip op. at 13–14.[10] Moreover, the court held that this interest was within the zone of interests sought to be protected by the Shipping Act, 1916.[11] Therefore, it concluded that the

10. The court pointed out that the Supreme Court has long recognized " '. . . the legitimate interest of public officials and administrative commissions, federal and state, to resist the endeavor to prevent enforcement of statutes in relation to which they have official duties.' " *United States v. FMC, supra,* slip op. at 15, quoting *Coleman v. Miller*, 307 U.S. 433, 441–42, 59 S.Ct. 972, 976, 83 L.Ed. 1385 (1939). The court concluded that the challenged Commission action "directly and specifically" interfered with this "legitimate interest," *id.* at 14–15, because the Department is "charged with

the responsibility for enforcing the antitrust laws, . . . [and] but for Commission approval, would proscribe [such] agreements," *id.* at 16 (footnote omitted).

11. The court found that the statutory constraints placed on the Commission's ability to protect anticompetitive agreements from prosecution were an attempt by Congress to protect the consumer and shipping interests. *Id.* at 17. It held that the Justice Department, "as public enforcer of the antitrust laws," was entitled to represent those interests. *Id.*

Department met the traditional standing requirements in that case.

The court went on to find that nothing in the Hobbs Act's language or history indicated that Congress meant to preclude the Department from assuming the role of a petitioner for review despite its possession of the "essential attributes of a party aggrieved." *Id.* at 18. It noted that the Act neither "requires the Attorney General to defend agency orders nor precludes an independent agency defense," *id.,* so that no practical problems bar an interpretation entitling Justice to seek review. *Id.* at 19. Moreover, it pointed to debates on related bills which indicate that Congress envisioned judicial resolution of similar interagency disputes, *id.* at 22–27, as well as early cases in which such resolutions were effected. *Id.* at 28–31. Therefore, the court concluded that Justice had standing to compel court review of Commission actions under the Hobbs Act.

We can perceive no distinction between the instant case and that decided by the panel in *United States v. FMC, supra.* Once again, Justice is challenging a Commission order which interferes with Justice's own interpretation of its responsibility to enforce the antitrust laws by insulating an anticompetitive agreement from prosecution. The interests ostensibly protected by this challenge—shippers' and consumers'—are identical to those protected in the former case. Therefore, for the reasons advanced in *United States v. FMC, supra,* we conclude that Justice had standing to bring this action.

### B. *Case or Controversy*

■ The intervenors' final argument against the Department's authority to sue is that, notwithstanding any statutory authorization to petition for review, no Article III "case or controversy" exists because "the United States is suing itself." Brief for Intervenor Sea-Land Service, Inc. at 27. Like the standing issues, this issue was decided in favor of Justice by the panel in *United States v. FMC, supra.* The court held the controversy justiciable because it met the requirements established by the Supreme Court in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), for the judicial resolution of interagency disputes: it "raises issues that courts traditionally resolve and the setting assures ... concrete adverseness[.]" *United States v. FMC, supra,* slip op. at 33. Once again, we see no distinction between the cases which would cause us to reach a contrary conclusion.

### III. SUBSTANTIAL EVIDENCE

■ A reviewing court such as this one can only reverse an agency action if it finds that action "unsupported by substantial evidence." 5 U.S.C. § 1009(e)(5). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). The Court specifically pointed out that "[t]his is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. FMC,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

The Department argues that the Commission's order is unsupported by substantial evidence with regard to each of the major issues: the existence of overtonnaging, the prevalence of malpractices, and the need for a pool. Though we find the record to be close on each of these points, and might not have decided them initially as the Commission did, we find in each instance the Commission's decision was supported by substantial evidence.

### A. *Overtonnaging*

The ALJ concluded that overtonnaging existed on the basis of Scaffardi's testimony. This testimony established that three-quarters again as much capacity existed as was necessary for the conference's westbound trade. Accepting the Department's argument that no overtonnage exists if the

capacity is utilized for eastbound shipments, J.A. 508 n.5 (Decision of the ALJ), the ALJ focused on Scaffardi's statement on cross-examination that "the cargo eastbound to Italy is less than the westbound cargo" to establish the crucial proposition that the proponents' overtonnage figures were economically meaningful, rather than the unavoidable incidence of a trade imbalance. *See* J.A. 508. The FMC, when reviewing the proceeding, concluded that this "finding is supported by the record and will not be overturned." J.A. 552 (Order Adopting Initial Decision).

The Department argues that this decision was in error because both the ALJ, and inferentially the FMC, considered only evidence about the trade to and from Italy, whereas according to Scaffardi's own testimony:

> The vessel leaving the east coast of the United States is taking cargo not only to Italy but to Spain, France, Italy, Greece and North Africa, so you have to consider the whole picture, not just Italy, in this particular case, when you are talking about east bound.

J.A. 164. Were Scaffardi's quoted statements about capacity all that was in the record, we would be tempted to reverse under the substantial evidence test.

However, Scaffardi testified later as to the volume of the entire eastbound Mediterranean trade. Though admitting that different standards of measurement were used in each instance,[12] he concluded that "[t]herefore, in the eastbound, you will always find a lot of empty containers carried from the east coast to the Mediterranean." J.A. 166. While this evidence is far from conclusive on the issue of whether the overtonnage existing on the westbound route is due

to an imbalance of trade—the Department argues that the excess container capacity on the eastbound route might result from the need to distribute heavier objects over greater shipping space, for example, *see* Reply Brief for the United States at 18–19 —in light of the lack of any contrary evidence and the surface plausibility of proponents' evidence, we must find that the FMC's factual decision on this point was supported by substantial evidence.[13]

### B. *Malpractices*

The ALJ concluded that the malpractice of rebating was prevalent in the involved route, though he admitted that the proponents of the pool had not produced "direct evidence of serious malpractices existing in the WINAC trade and that there is absolutely no data in the record to show whether rebates are in fact being paid." J.A. 515 (Decision of ALJ). The FMC upheld his decision despite the fact that it was supported only by hearsay and historical evidence of abuses. J.A. 550–51 (Order Adopting Initial Decision). The Department argues it was error to find that the substantial evidence standard was met on the basis of such weak evidence.

However, the proponents put forward a strong case for the unavailability of direct evidence of rebating, *see* note 8 *supra*, one which the Department never rebutted and the ALJ accepted, *see* J.A. 513–16. The Supreme Court has made clear that in such situations, the substantial evidence standard can be met by drawing inferences from indirect evidence:

> Having correctly noted that positive proof on various aspects of the case was simply not available one way or the other, the Commission was fully entitled to

---

12. "[T]he Italian cargo is volume cargo while the eastbound cargo from the United States to Italy, as well as the Mediterranean, in the majority of cases is weight cargo." J.A. 165–66 (testimony of Scaffardi).

13. It must be pointed out that we are not in this case unreservedly sanctioning the FMC's decision that "[i]f [the Department] seriously wished to advance its 'economically meaningful overtonnaging' argument, it should have of-

fered the necessary facts upon which to support this position." J.A. 552 (Order Adopting Initial Decision). Situations may arise in which the record does not even superficially refute the Department's arguments; then it may be proper to require additional data from the companies before requiring the Department to substantiate its own argument. However, this is not such a case.

draw inferences on these points from the incomplete evidence that was available. *FMC v. Svenska Amerika Linien*, 390 U.S. 238, 249, 88 S.Ct. 1005, 1011, 19 L.Ed.2d 1071 (1968).

Moreover, the evidence put forward by the proponents was not as weak as the Department suggests. In addition to the admittedly unsubstantiated rumors of rebating, the proponents' witnesses testified to proven past violations of the Shipping Act by WINAC carriers, and submitted evidence that the circumstances giving rise to those violations continue to exist. *See* J.A. 518 (Decision of ALJ). The inferences drawn from these facts tend to buttress the credibility of the proponents' witnesses, and substantiate their unproven allegations of continuing malpractices. In sum, then, we find the FMC's decision as to the continued existence of malpractices supported by substantial evidence.

### C. *Propriety of the Remedy*

The Department's final argument is that the FMC gave insufficient consideration to the possibility of using less anticompetitive means to solve the problems plaguing the WINAC route. However, the ALJ explicitly considered and rejected the Department's argument as to the existence of less anticompetitive alternatives, *see* J.A. 519–23, a decision which the FMC summarily affirmed. J.A. 552. Considerable evidence disputing the efficacy of a free market solution exists on the record, *see* J.A. 80–83, 104–06; therefore we must again hold that the Commission's decision is supported by substantial evidence.

*The order of the Federal Maritime Commission is hereby affirmed.*

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. The concern here is with standing, not wisdom. It is not with the incongruities possible when federal agencies bring their internecine policy disputes to court; or with the tragicomic spectacle presented to international shippers who must wait while the U.S. government sues itself; or with the potential burden on the judicial process when DOJ can drag into court every agency order it doesn't like; or with the policy implications when DOJ functions as a supernumerary nanny over the agency charged

MARKEY, Chief Judge, United States Court of Customs and Patent Appeals,* concurring:

Most respectfully, I can concur only in the result.

If the merits of the FMC order were reachable, I would concur with the conclusion that it is supported by substantial evidence and would fully join the per curiam's admirably succinct explication of the reasons for that conclusion.

I cannot, however, agree that the Department of Justice (DOJ) has standing to appeal FMC orders approving international conference agreements under § 15 of the Shipping Act, 46 U.S.C. § 814 (1976).[1] Nor can I agree that DOJ has met the constitutionally required burden of presenting a true case or controversy.

### *Standing*

Concerning the authority and thus the standing of DOJ to bring this appeal, the present opinion of the majority relies upon that of another panel in *United States v. FMC*, No. 79–1299 (D.C.Cir. December 19, 1980). That panel correctly recognized that the jurisdictional question was there one of "first impression", but in my view its answer to that question results in an unwarranted extension of the concept of standing.

Relying *solely* on its "responsibility to enforce the antitrust laws", DOJ asserts that it is a "party aggrieved" by the FMC's final order within the meaning of 28 U.S.C. § 2344 (1976).[2] Standing is not achieved, however, by rhetoric about responsibility.

---

with overseeing international agreements. That a myopic zeal for enforcement of antitrust laws may produce strange results, particularly in areas of foreign trade, has been remarked, however, in the public press. *The Washington Post*, May 25, 1980, at B–6.

2. As recognized in the earlier panel opinion (n. 25), DOJ's participation in the FMC proceeding and its displeasure with the outcome did not alone render it "a party aggrieved" such as to insure a right to judicial review. Indeed, DOJ's insistence on its right to challenge FMC approvals of conference agreements under § 15,

Congress necessarily intended in the Shipping Act[3] that DOJ stay its hand when FMC has approved a conference agreement. Hence, if DOJ has been "aggrieved", it has been aggrieved by Congress, not by FMC.

Focusing on the Hobbs Act,[4] the earlier panel and the majority here find no direct prohibition in *that* Act against DOJ's assuming the role of a supervisor of FMC and a petitioner for review of its § 15 orders. However that may be,[5] I respectfully submit that attention has centered on the wrong Act, and that Congress effectively denied DOJ that role in the *Shipping Act.*

In *Federal Maritime Board v. Isbrandtsen Co.*, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958), the Isbrandtsen Co. petitioned this court to review, under 5 U.S.C. § 1034 (1952),[6] an order of the Federal Maritime Board (FMB) approving a rate system proposed by the Japan-Atlantic and Gulf Freight Conference (the Conference). The FMB was named a respondent. The United States, named as statutory respondent, appeared by DOJ and joined Isbrandtsen in attacking the FMB order.

Under the proposed system in *Isbrandtsen,* a shipper would pay less than normal freight rates in exchange for signing an exclusive-patronage contract with the Conference. Contract rates would be set below noncontract rates.[7] This court set aside the FMB order, holding the system of dual rates illegal *per se* under the Shipping Act, 1916. The Supreme Court affirmed.

Following *Isbrandtsen,* Congress commenced a full-scale study of steamship conferences and relations with shippers, with a view toward amending the Shipping Act, 1916. The primary purpose of the resulting legislation was to authorize ocean common carriers, and conferences thereof serving the foreign commerce of the United States, to enter into effective and fair dual rate contracts with shippers. H.R.Rep.No.498,

founded entirely on its "responsibility to enforce the antitrust laws", bears no relation to whether it participated below. Its "responsibility" for enforcement would be no less if its *manner of performing* that responsibility involved a failure to participate before the agency.

Similarly, DOJ offers no basis for singling out its responsibility for enforcement of the antitrust laws from its responsibilities for enforcement of other laws, and no explanation of why its theory here would not equally justify its appeal of every agency decision the effect of which on any of its responsibilities it disliked. Injection of DOJ into other agency operations may or may not be appropriate. It is singularly inappropriate to inject DOJ into our country's international shipping relationships.

3. 46 U.S.C. § 801 et seq. (1976).

4. 28 U.S.C. § 2341 et seq. (1976).

Whether DOJ may appeal an agency decision affecting the government's *proprietary* interests, whether it may participate in an appeal to *defend* an agency decision, and whether it may support a *private* appellant, are questions simply inapplicable here. The *sole* basis cited for DOJ's standing to appeal is its "responsibility to enforce the antitrust laws". That DOJ may be denied an appeal in connection with that responsibility is not fatal. The Double Jeopardy Clause of the Constitution precludes an appeal, for example, of an acquittal in a criminal enforcement of the antitrust laws.

5. As the majority appreciates, the Hobbs Act states that "[t]he Attorney General is responsible for and has control of the interests of the Government in all court proceedings under this chapter." 28 U.S.C. § 2348 (1976). Considering that language alone, a holding that DOJ has standing here produces an obvious dilemma, in which the Attorney General must simultaneously represent the interests of the government (petitioner DOJ) and the interests of the government (respondent FMC) in the same suit. Unless it be said that FMC's § 15 agreement approvals serve no governmental interests, DOJ's assertion of standing here reduces to the absurd.

That the Hobbs Act preserves the right of an agency to participate in all cases, including those in which the Attorney General considers the agency in error, contemplates the presence of an interested private party. It is not, in my view, an authorization for the Attorney General to sue the agency, absent the proprietary interest exception found in *United States v. ICC,* 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), discussed infra.

6. Now 28 U.S.C. § 2344 (1976).

7. Dual rate or exclusive patronage systems have an anticompetitive effect because the cargo of contract shippers becomes unavailable to nonconference carriers. When shippers sign dual rate contracts, nonconference carriers (like Isbrandtsen) have less cargo and may be forced to withdraw from competition.

87th Cong., 1st Sess. 1–3 (1916); S.Rep.No. 860, 87th Cong., 1st Sess. 1 (1961), U.S.Code Cong. & Admin.News 1961, 3108.

In *Isbrandtsen* and the subsequent Congressional hearings, DOJ took a traditional antitrust approach and attacked the dual rate system. Congress, however, repudiated that narrow perspective and relied upon the FMC for a balanced approach to regulation in the industry.

That Congress never intended FMC § 15 orders to be challengeable by DOJ is illustrated in the legislative history of § 15, H.R.Rep.No.498, 87th Cong., 1st Sess. 12–13 (1961); S.Rep.No.860, 87th Cong., 1st Sess. 2 (1961), U.S.Code Cong. & Admin.News 1961, 3109:

> The Department of Justice testimony on the legislation was generally unfavorable. While its position is consistent with the antitrust policy of the United States, it fails to take into account the peculiar nature of the particular business involved. The ocean steamship industry is unique among transportation services in a number of respects.
>
> \*    \*    \*    \*    \*    \*
>
> The committee believes that the present bill represents a minimum but necessary deviation from the concepts of the antitrust law.
>
> \*    \*    \*    \*    \*    \*

Throughout the course of the hearings, the committee has been confronted with the problem of endeavoring to reconcile the conflict between our traditional antitrust concepts and the needs of our foreign waterborne commerce. Witnesses before the committee have been practically unanimous in their support of the conference system . . . .

The hearings of the committee have made it quite clear that our traditional antitrust concepts cannot be fully applied to this aspect of international commerce. Your committee has concluded that any

attempt to effect regulation of this commerce in a measure comparable to that applied to our domestic commerce would be highly detrimental to our essential American-flag merchant marine. Accordingly, the committee has decided that it should encourage the continued maintenance of effective conferences and that, within safeguards, it should authorize and direct the [FMC] to approve exclusive patronage arrangements without which conferences might well become ineffective.

DOJ should not be permitted here to accomplish through the courts that which it was denied by the Congress.[8]

Congress specifically recognized that American shipping would be injured if conference agreements violative of our antitrust laws could not be entered and carried out. H.R.Rep.No.498, 87th Cong., 1st Sess. 13 (1961); S.Rep.No.860, 87th Cong., 1st Sess. 2 (1961). It recognized that American interests would be disserved if foreign ship operators were confronted by what they would view as an ogre, that is, by DOJ and its zeal for enforcement of our antitrust laws. It therefore provided a mechanism, in the form of FMC approval of conference agreements, by which foreign ship operators, having escaped the jaundiced eye of DOJ by entering the agreements, would refrain from rate wars injurious to American shipping. Fully aware of DOJ's views, and in specific recognition that every § 15 approval would violate our antitrust laws, Congress authorized the FMC to grant approvals under appropriate circumstances. Considering this background, I cannot agree with the earlier panel and with the majority here that Congress intended DOJ to inject itself into the sensitive area of international shipping relations and to exercise a supervisory role over the FMC § 15 approval mechanism. Congress intended that FMC, not DOJ, guard the public inter-

---

**8.** Congress was dealing with international shipping relations. In granting FMC the authority to approve shipping agreements violative of the antitrust laws, it need not have added an explicit statement that DOJ's responsibility to en-

force those laws, whether directly or by appeal, was thereby rendered inapplicable to those agreements. There must be room for congressional common sense.

est in this one limited area of international trade relations.

Congress created the FMC to provide a forum for the solution of technical and complex matters involved in the shipping industry, *Port of New York Authority v. FMC*, 429 F.2d 663, 666 (5th Cir. 1970), cert. denied 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971). FMC, as the "public arbiter of competition" in the industry, must consider the antitrust implications of a § 15 agreement before approving it,[9] *FMC v. Pacific Maritime Assn.*, 435 U.S. 40, 53, 98 S.Ct. 927, 935, 55 L.Ed.2d 96 (1978); *FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 739, 93 S.Ct. 1773, 1781, 36 L.Ed.2d 620 (1973), thereby discharging its statutory duty to guard the public interest. *Marine Space Enclosures, Inc. v. FMC*, 420 F.2d 577, 585 (D.C.Cir.1969). After an agreement has been approved, the agreement and acts done pursuant thereto are exempt from provisions of the antitrust laws. 46 U.S.C. § 814 (1976). H.R.Rep.No.498, 87th Cong., 1st Sess. 5 (1961). Congress thus recognized that the public interest encompassed, in those instances, a continuation of American shipping unlikely or impossible under other circumstances.

It is incongruous and inappropriate for DOJ to predicate a claim to standing solely on its independently developed policy interests in the precise field of regulation delegated by Congress to the FMC. That FMC and DOJ would thus wind up working at cross-purposes was not, in my view, contemplated by Congress. Rather, having conferred specific authority upon the FMC in the Shipping Act, Congress could have had no anathematic intent that DOJ should review all FMC § 15 approvals and decide

which ones it will appeal, or that FMC and DOJ be pitted against each other in policy disputes before the courts. It is a fundamental principle of statutory interpretation that Congress will not be presumed to have intended an anomalous result. *Bulova Watch Co. v. United States*, 365 U.S. 753, 757, 81 S.Ct. 864, 867, 6 L.Ed.2d 72 (1961); *United States v. New York & Cuba Mail Steamship Co.*, 269 U.S. 304, 310, 46 S.Ct. 114, 115, 70 L.Ed. 281 (1925).

### Case or Controversy

If DOJ has here presented the case or controversy required by Art. III, § 2 of the Constitution, it escapes detection. Careful review and study establishes the presence of interagency disagreement, but fails to unearth a constitutionally required case or controversy.

The issue on the merits is couched in terms of whether the FMC order is supported by substantial evidence. If brought by a private carrier having a pecuniary or proprietary interest in the outcome, there would be no question of standing or "case or controversy". That would be "the kind of controversy courts traditionally resolve". *United States v. Nixon*, 418 U.S. 683, 696, 94 S.Ct. 3090, 3101, 41 L.Ed.2d 1039 (1974).[10] *See Federal Maritime Board v. Isbrandtsen Co.*, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958). The true issue presented however, is whether the DOJ view of antitrust law and the public interest, or that of FMC, shall be applied to the conference agreement involved.

Recognizing the absence of a private carrier claiming injury, and nowhere pointing to any specific party injured in any particu-

---

**9.** Nowhere in the Shipping Act did Congress refer FMC to DOJ for consideration of antitrust implications in FMC orders. On the contrary, it relied entirely on the expertise of the FMC for approval or disapproval of anti-competitive agreements in the international shipping trade. Having determined that the public interest includes maintenance of an American shipping capacity, Congress gave an agency steeped in the history and nuances of ocean shipping the extraordinary authority to approve conduct otherwise violative of our antitrust laws.

DOJ's effort here is a back-door attempt to undo what Congress did.

**10.** *United States v. Nixon* was a special case, involving a Special Prosecutor and a subpoena for evidence in a criminal proceeding. In providing for a Special Prosecutor, Congress clearly contemplated not only the possibility but the certainty that he would be pitted against elements of the Executive branch and may have "to use judicial processes to pursue evidence", 418 U.S. at 695 n. 9, 94 S.Ct. at 3101.

lar manner, DOJ attempts to wrap itself in a private party mantle, urging that it acts "on behalf of all citizens" and "on behalf of the aggrieved interests of all of the citizenry." It does indeed so act, and absent § 15 of the Shipping Act, it would be free to attack the American carriers party to the FMC-approved agreement in this case. The difficulty is that those American carriers are also "citizens", that "all citizens" have an interest in the preservation of American shipping, and that Congress has directed the FMC to include all those interests when it balances the public interest.

Permitting DOJ to appeal those § 15 approvals which *it* considers unsupported by substantial evidence merely brings to the courts interagency disputes arising from different views of antitrust law and the public interest. That, however, is a matter of policy and the approach of each agency to its duties and functions.

As stated in *Flast v. Cohen*, 392 U.S. 83, 94–95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968):

> Embodied in the words "cases" and "controversies" are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine.

Justiciability goes beyond mere disagreement. Because the United States is suing itself,[11] and considering the nature of the disagreement, this case is not a true case or controversy. Rather, it is a policy disagreement between the FMC and DOJ, each acting "on behalf of all citizens" and each

asking the court to approve its view concerning the weight to be given antitrust implications of a particular § 15 agreement.

Unlike *United States v. ICC*, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), where the United States sought judicial review of ICC action, to protect the proprietary interest of the United States as a shipper, DOJ cannot and does not allege any proprietary interest here. Again unlike *ICC*, where DOJ espoused the property interest of a third agency-proprietor (Army), it here presents only its own antitrust policy views. The *U. S. v. U. S.* "anomaly" referred to in *ICC* as merely on the "surface", 337 U.S. at 432, 69 S.Ct. at 1414, permeates the entirety of the present case. The proprietary interest *exception* to the anomaly should not be extended to cases involving *no* proprietary interest of the United States. Art. III, § 2 of the Constitution does not, in my view, permit injection of the courts into a mere policy dispute between agencies of the Executive branch like the one before us.

Accordingly, because DOJ lacks authority productive of standing, and because it has failed to present a true case or controversy, I would have dismissed the appeal.

---

11. Though the case is captioned *United States of America v. FMC*, the true statutory respondent is the United States, not the FMC. 28 U.S.C. § 2344 (1976).